NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0569n.06

**No. 10-5061**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Aug 15, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| MARQUICE KENYATTA BOND, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: GUY, COOK, and STRANCH, Circuit Judges.

COOK, Circuit Judge.   Federal prisoner Marquice Bond appeals his drug and firearm convictions, alleging that the district court erroneously admitted into evidence items that police found during an unconstitutional search of his hotel room.  We affirm.

I.

The charges against Bond arose in early 2009.  On the day of the incident, Kentucky State Police Officers Slinker and Young were canvassing a string of hotels in an unmarked SUV while they assisted in a drug sting operation.  As the officers left a hotel parking lot, they noticed a car behind them "driving erratically, going from side to side and tailgating."  Because the officers did not want to jeopardize their active case, they pulled into a gas station to let the car pass.  The car, however, followed them and drove up beside their SUV.  Bond emerged from the driver's seat, gestured at the

officers' car, and tried to peer into its tinted windows. When the officers did not respond, Bond got into his car and sped off, again weaving between lanes.

Slinker and Young, suspicious of Bond's peculiar behavior, requested temporary leave from their detail to investigate. The officers stopped Bond's car and approached it. Young smelled marijuana and requested that Bond exit the vehicle. During a pat-down, Young found a small baggie of marijuana in Bond's pocket. The officers asked Bond for identification; he presented an ID bearing the name "Kevin L. Mays."[1] They ran the ID and discovered that "Mays" lacked driving privileges. The officers then received Bond's permission to search his vehicle and called a nearby canine officer, Trooper Jason Denny, to perform the search. Denny's dog alerted on a duffel bag in the trunk, where officers found more marijuana fragments. Because the officers did not want to abandon their sting investigation, they did not plan to arrest Bond and repeatedly told him this. The officers nonetheless warned him that because his circumstances were suspicious, they might need to investigate further. They then offered to drive him home. Bond accepted the proposal and stated that he was residing at a nearby hotel.

When the group arrived at the hotel, Denny accompanied Bond to the lobby, where Bond requested his key card. Bond told the officers that he was staying in room 103, but the card did not work when he tried it in the door. Slinker walked with Bond back to the lobby, handed the

---

[1]Following Bond's arrest, detention center employees eventually discovered that Bond was using an acquaintance's identification card.

receptionist Bond's ID, and asked for his room number. The receptionist explained that Bond was staying in room *102*; Bond immediately balked that 102 was *not* his room. As the four men approached room 102, Bond maintained that the receptionist was mistaken. Slinker replied that he questioned Bond's honesty, and that if Bond refused to cooperate, he would "attempt to obtain a search warrant." At that point, Bond exclaimed, "F-ck it!," grabbed the key card, and unlocked the door. On entering the room, officers saw a large bag of marijuana sitting in plain view; Bond admitted that the bag was his. He also explained that he had firearms hidden under the mattress. The police then arrested Bond.

Bond immediately moved to suppress the marijuana and firearms that the police found in his room, arguing that he never consented to the warrantless search. At the suppression hearing, the court—while recognizing that it was "a very close case"—determined that Bond, by unlocking his hotel door, *did* voluntarily consent to the search, and that none of the officers' actions rendered this consent invalid. Following the court's ruling, Bond pleaded guilty to possession of marijuana with intent to distribute and possession of firearms in furtherance of drug trafficking, but preserved the right to appeal his conviction on the suppression issue. He now exercises that right.

II.

"In reviewing the denial of a motion to suppress, this court reviews findings of fact for clear

error and conclusions of law de novo."[2] *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006). "In reviewing the district court's findings of fact, we consider evidence in the light most favorable to the government." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

When the government offers consent as justification for the warrantless search of a defendant's property, it must show that consent was voluntary—that it was "unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." *United States v. Williams*, 754 F.2d 672, 674–75 (6th Cir. 1985). "[W]hether a consent to a search was in fact 'voluntary' . . . is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Relevant factors include "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (internal quotation marks and citation omitted). Additionally, the voluntariness of a defendant's consent "must be examined within the overall context and psychological impact of the entire sequence of events." *United States v. Jones*, 846 F.2d 358, 361 (6th Cir. 1988) (per curiam).

---

[2]"A finding is clearly erroneous where, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Webb*, 616 F.3d 605, 609 (6th Cir. 2010) (internal quotation marks and citation omitted). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 (1949).

Bond argues that he did not consent to the police's warrantless search of his hotel room. He claims that, while he never refused the search verbally, his evasive behavior spoke for itself. He also states that the officers' actions—their failure to inform him of his right to withhold consent, their "overpowering presence," and their threat to obtain a search warrant—tainted his alleged consent in any case. We examine first whether Bond's actions adequately demonstrated consent, and second whether other factors contaminated it.

As a primary matter, Bond asserts that his "actions and words established that he did not want the police to search his room." In reaching the contrary conclusion, the court admitted that Bond's diversionary tactics did at first evidence an unequivocal *lack* of consent. But, the court maintained, Bond's position abruptly changed when the police followed him to his room, as clearly demonstrated by his snatching the key and unlocking the door:

> He actually says, F it, reaches over and gets the key. And he, by his own testimony, he opened the door himself. Regardless of—I'm sorry. He put the key in the door himself.
>
> Now, he says he didn't push the door open. He says the police pushed the door open. It doesn't matter for the purpose of this analysis who pushed the door open. But the defendant himself opened the door.
>
> He—so he gave his consent at that point. I think he made a reasoned decision. And, actually, then later decides to try to make the best of it and makes some calls and so forth.
>
> And I don't necessarily use that as support, but I do look at his actions as the

> product of some rational thought. He thought about it. He thought about what they were saying and decided that they could go get a search warrant, and that he was going to open the door himself.

The court thus found that Bond, in taking his key from the officers and unlocking the door, unequivocally and specifically consented to a room search. The court moreover decided that this act was "the product of some rational thought"—that Bond gave his consent intelligently. Considering all the evidence in the light most favorable to the government, we agree that the district court offers one permissible interpretation of the facts: although Bond initially tried to deceive the police, when he realized that his scheme would fail, he made a calculated decision to abandon the plan and consent to a search. The court's findings are thus not clearly erroneous. *See Yellow Cab Co.*, 338 U.S. at 342.

Accepting the district court's determination that Bond consented to the search, we now turn to our second inquiry—whether coercion or duress contaminated these acts. Bond first complains that the police never advised him of his Fourth Amendment rights and that he consequently did not know that he could refuse the search of his hotel room. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Schneckloth*, 412 U.S. at 227. And, contrary to his allegation, Bond testified at the suppression hearing that when Slinker mentioned seeking a warrant, the officer "g[ave] [Bond] the *option* like he's going to get a search warrant." The government accordingly argues that, despite receiving no explicit warning, Bond—due to his prior arrests and convictions—was aware of his Fourth Amendment right to withhold consent. As further evidence that Bond understood his

constitutional rights, the government highlights that he claimed to be familiar with his *Miranda* rights

"to a degree." Although the officers' failure to warn Bond of his right to refuse a search does weigh

in Bond's favor, its overall effect is not outcome determinative, especially in light of his own

conflicting testimony.

Second, Bond argues that in opening his door, he did not consent, but "simply succumbed to

[the police officers'] persistent efforts to gain entry." Indeed, "a search based on consent requires

more than the mere expression of approval to the search." *United States v. Jones*, 641 F.2d 425, 429

(6th Cir. 1981), *overruled on other grounds by Steagald v. United States*, 451 U.S. 204 (1981), *as

recognized in United States v. Hardin*, 539 F.3d 404, 412 (6th Cir. 2008). In his brief, Bond

complains of "overpowering police presence," emphasizing that three officers—two of whom donned

tactical combat uniforms—escorted him back to his hotel. Yet these two factors appear to have little

bearing on "the overall context and psychological impact of the entire sequence of events." *See

Jones*, 846 F.2d at 361.[3] Though Slinker and Young wore army fatigues and heavy vests, they were

not "more heavily armed than the normal police officer." Nor did their appearance faze Bond, whom

---

[3]Bond compares his circumstances to those of this second *Jones* case, in which we reversed a district court's finding of consent to the warrantless search of a defendant's residence. We now distinguish that case factually. In *Jones*, three police cars barricaded the defendant's car during a traffic stop, leading the defendant—who had no formal education and was illiterate—to believe that he was under arrest and thus had to comply with police requests. Acting under this erroneous belief, the defendant followed the officers' orders that he take them to his house and allow them to search it. In Bond's instance, the police took no such theatrical measures to detain him and reassured him that he was *not* under arrest. Moreover, the police did not insist that Bond take them to his hotel, but merely offered to drive him there so that he did not have to hail a cab. In short, the relatively benign police conduct in Bond's case bears few of the coercive signs present in *Jones*.

they described as oddly "calm," "jovial," and "laughing." During the traffic stop, the officers continually assured Bond that he was not under arrest, and at no point did they draw their weapons. When Bond accepted their offer for a ride back to his hotel, he sat unrestrained in the front seat and casually conversed with the officers. In fact, he only lost his composure when the hotel clerk—not the police—debunked his front. Under the totality of the circumstances, the "overpowering police presence" Bond describes does not appear to have influenced his actions in any significant manner.

Finally, Bond alleges that the police, by threatening to obtain a warrant for his room, coerced his consent. In limited circumstances, an officer's threat to obtain a warrant if a defendant does not consent to a search can taint that defendant's consent—namely, when the threats are "baseless" or a pretext to coerce the defendant. *United States v. Salvo*, 133 F.3d 943, 954 (6th Cir. 1998); *United States v. Blanco*, 844 F.2d 344, 351 (6th Cir. 1988). At the motion hearing, the district court discussed this issue at length. As the court explained, the officers' threat was not "baseless" or "bogus," but instead grounded in "the underlying investigation, [Bond's] erratic behavior, [] the empty duffel bag, [] the smell of marijuana emanating from that duffel bag, the shake in there, and the smell of burnt marijuana from the car." As such, it concluded, the threat did not taint Bond's consent.

Again, reviewing the totality of these factors and viewing the evidence in the light most favorable to the government, we are not left with a "definite and firm conviction" that the district

court erred by finding that Bond's conduct was uncontaminated by duress or coercion. *See Webb*, 616

F.3d at 609.

III.

We accordingly affirm the district court's decision.