**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0771n.06

**No. 11-3682**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Jul 17, 2012*

LEONARD GREEN, Clerk

| | |
|---|---|
| JAMES TURK; MARY BETH TURK, individually and as mother of WKT and KMT, minors, ) ) ) | |
| Plaintiffs-Appellants, ) ) | |
| v. ) ) | On Appeal from the United States District Court for the Northern District of Ohio |
| DANIEL COMERFORD; JASON STASENKO; NICK ) REXING; MARK ADAMS, individually and in his ) official capacity with the other Cuyahoga County ) Sheriff's Office, ) ) | |
| Defendants-Appellees. ) | |

Before:     BOGGS, NORRIS, and KETHLEDGE, Circuit Judges.

BOGGS, Circuit Judge.   James and Mary Beth Turk appeal two district-court decisions granting qualified immunity to officers from an FBI task force who entered and searched their home.  The officers were looking for fugitive John Mattice.  Four days earlier, Turk[1] had accompanied Mattice to the scene of a sexual assault that Mattice allegedly committed.  According to the Turks' complaint and evidence, the officers surrounded the Turks' home without any indication that Mattice was with Turk, pushed through his door as he turned the deadbolt, and searched his house, threatening him with jail time all the while.  The Turks filed this § 1983 suit, alleging that the officers violated their Fourth Amendment rights.  Over the course of two summary-

---

[1] "Turk" will refer to James Turk.  "Mrs. Turk" will refer to his wife, Mary Beth Turk.

judgment motions, decided by different judges, the district court held that all of the officers were entitled to qualified immunity on all of the Turks' claims. For reasons discussed below, we affirm the decisions granting qualified immunity to an officer who was not present during the initial entry and remained with Turk during the subsequent search, and to all officers on the Turks' claim that the officers violated their Fourth Amendment rights by entering the curtilage of their home. However, we reverse the decisions granting qualified immunity on the Turks' illegal-entry, illegal-search, and illegal-detention claims, and remand for further proceedings consistent with this opinion.

I

Taken in the light most favorable to the Turks, the facts are as follows. On Friday, February 13, 2009, former police officer James Turk met John Mattice at the intersection of Interstate 480 and Ridge Road in Cleveland, Ohio. Unbeknownst to Turk,[2] who was working as a private investigator for attorney Ed Heffernan, Cleveland Police had arrested Mattice for rape in October 2008. Worse, because Mattice missed a scheduled court appearance, a bench warrant for his arrest had been issued. Turk went with Mattice to 3900 Fulton Court, the scene of the alleged crime, and spoke with a tenant named Emily.[3] On request, he gave Emily one business card with his name, and another with both his and Heffernan's. He then asked for, and received, permission to take a photograph of the couch where the incident took place and left. The entire visit, according to Turk, took approximately ninety

_____

[2] Turk allegedly did not learn what Mattice was wanted for until Sunday, February 15 or Monday, February 16, when he read a newspaper article featuring Mattice as the fugitive of the week.

[3] Emily, apparently, was Mattice's former girlfriend. It is not clear whether Turk knew this at the time of his visit.

seconds. After leaving the scene of the alleged crime, Turk dropped Mattice off in the same place that he had picked him up earlier and proceeded to Akron on other business.

The Cleveland/Cuyahoga Fugitive/Gang Task Force (Task Force), a group of officers from various law-enforcement agencies, deputized as federal agents by the FBI, began searching for Mattice when he failed to appear in court "[o]n or about February 10, 2009." Because the alleged rape occurred at 3900 Fulton Court, and 3900 Fulton Court was the address listed on Mattice's arrest warrant, Task Force Officers Jason Stasenko and Mark Adams began their search at 3900 Fulton Court. They learned that Mattice no longer lived at that address, but got Emily's contact information from a current resident. Emily and Stasenko spoke several times over the next three days. "[A]t one point [Emily] indicated that Mattice had grown suspicious that she was helping the police, that she feared for her safety, and that she no longer believed she could assist [the Task Force] in locating Mattice." On February 13, Emily called Stasenko, sounding "panicky . . . scared and intimidated." She told Stasenko that Turk and Mattice had come to 3900 Fulton Court while she was there, that "Turk was pushy, [and] pushed his way into the house," and that the two men left together in the same car.[4] Stasenko ran Turk's name through a number of databases. He learned Turk's home address and that Turk had been found not guilty of Intimidation in the Cuyahoga County Common Pleas Court.

On the morning of Tuesday, February 17, Turk's son was getting ready for school when he saw a man with a cap, dark clothing, and a gun outside of his window. He told his father that he

---

[4] Turk denies that he was pushy, and claims that he tape recorded his interaction with Emily to guard against such accusations.

thought there was a terrorist in the backyard. Turk told his son to get behind him, and walked toward his daughter's room. Through his front window, Turk saw cars and men in hats "all over the place." Before he could reach his daughter, someone "pounded on the door . . . screaming out pounding on the windows saying, Mr. Turk, you're fucking going to jail right now, you're going to jail, open the door." In response to Turk's asking what was going on, the officer responded: "Open this door right now, you're going to jail." Task Force officers, Turk claimed, were "banging on the front door with something, a lead pipe, flashlight, [so hard that] things were shaking all over the place."

Because "the window on the front door [was] shaking," Turk "went to open the door." The front door of Turk's house is a double door. Only the left-hand door opens—the right-hand door "is a dummy door."[5] The Task Force officers, however, did not know this and, as Turk "went to open the [left-hand] door . . . [the officers] tried to force" the right-hand door. Turk began to turn the deadbolt, but "didn't get it all the way because . . . somebody shoved the door open in [his] face." Indeed, Turk claims, the door splintered because Stasenko forced it open.

Turk's wife, Mary Beth, corroborated her husband's account, claiming that "the person outside the door was yelling open up, open up," and that "[w]hen [Turk] went to unlatch the deadbolt he never turned to open, or maybe it was pushed." She also insisted that she "never opened the front door," that "[a]s . . . Turk was manipulating the deadbolt to the front door . . . law enforcement simply barged/pushed into the foyer area of our home," and that she said nothing to any Task Force officer until the officers had entered her home. Stasenko, by contrast, claims that, after he knocked

---

[5] Although it is not entirely clear, it appears from the record that the door Turk opened was the left–hand door from his perspective, not the officers'.

on the door and identified himself as a police officer, "Mrs. Turk appeared in the doorway, opened the door and let [the Task Force] into the foyer. [His] recollection is that she said words to the effect of 'come inside, I have neighbors.'"

It is undisputed that Stasenko entered the home first, followed by Officer Mark Adams and Officer William Chapman.[6] Next came Officer Daniel Comerford, who had been in the Turks' backyard "covering" the back of the house "in the event the fugitive was present and tried to escape." Comerford came inside only after Stasenko, already inside the house, called him on the radio. Officer Nick Rexing, who had been at the side of, and then behind, the house, entered eventually.[7] Precisely when he came inside, however, is in dispute: Turk claims that he entered with Stasenko and Adams,[8] Rexing claims that he entered later. Although the officers did have a warrant for Mattice's arrest, they did not have a search warrant for Turk's home.

Turk captured most of what followed on a recording device hidden in his underwear.[9] Initially, Turk believed that the officers were associated with city animal control because Stasenko wore a vest with the initials "APA."[10] Thus, when Stasenko told Turk to put his German Shepherd

---

[6] Turk voluntarily dismissed his claim against Officer Chapman on December 18, 2009.

[7] Rexing explained that his task was "to establish a loose perimeter in the event the fugitive was present, to prevent his escape and protect the safety of officers on the scene."

[8] In his deposition, Turk claimed that he could not remember which other officers entered with Stasenko. He did testify, however, that Rexing was inside "harassing [his] family" from the outset.

[9] The parties agree that the recording is accurate.

[10] APA, Stasenko explained, means "Adult Parole Authority."

away, Turk responded: "Oh, I thought you said you were here for the dog." Mrs. Turk then said: "Go

through the entire house. . . . Get your people out of my front lawn." Immediately, Turk interjected:

"Wait a minute. Wait a minute. Wait a minute." *Ibid.* The following conversation ensued:[11]

> Officer: No, that's how we do this.
> Turk: Wait a minute. Because I work for an investigator.
> Officer: You know what?
> . . .
> Officer: I'm going to put you in cuffs, you're going to jail.
> Turk: What?
> Officer: All right. You were with this guy on Friday. So if you want to play around with me
> Turk: No, no, no, no, no, no, I don't want to play around.
> Mrs. Turk: You know, my kids are here, please.
> Officer: Wait a minute.
> Mr. Turk: I don't want to play around, okay.
> Officer: You were with him on Friday, right? Don't lie to me or you're going to jail. You understand?
> Mr. Turk: On the advice of my attorney - - can I call my attorney?
> Officer: You can call your attorney after we're done with you, okay?
> Mrs. Turk: Go through my house - -
> Officer: Is he here right now?
> Mrs. Turk: No.
> Mr. Turk: You cannot (inaudible) house (inaudible). [12]

Stasenko grabbed Turk's wrist and kept him in the foyer area, while other officers "spoke to [Mrs.

Turk] . . . about searching the house." Turk, at this point, asked his wife to get Heffernan's phone

number. She did so, and Turk spoke to Heffernan on the phone. Heffernan told him that, unless the

officers produced an arrest warrant, they would have to leave. Turk then gave the phone to Stasenko,

---

[11] The transcript of the recording does not indicate which officer is which.

[12] Not once in the transcript does any officer use the name "Mattice." All references are to "him," or "he."

who told Heffernan: "I'm letting you know that we're here - - they gave us consent to search, they're cooperating with us, okay. I told him that if he doesn't cooperate he's going to go to jail based on investigative purposes of the Sheriff's Department." Stasenko continued:

> Sir, all right, I'm just - - I'm doing a courtesy of talking to you. We have a warrant for [Mattice's] arrest, okay. If he turns himself in today, great. All right. We don't have to bother anymore [sic] people. Your client was with him on Friday, okay. That's why we're here. We have information - - listen. We have information from other sources that he was with him, okay. This gives us enough to come out here and talk to him, okay. If he didn't tell us a lot of stuff that we already know he was going to go to jail on our investigation and we were going to hold him for at least 72 hours if we didn't charge him with obstructing justice or harboring a fugitive, that kind of thing. Okay. That's why we're here now. They gave us consent to search, said he's not here, that's fine, and then they called you. That's why we're here. I don't care if he's going to arraignment, I don't care if he's, you know - - didn't go to (inaudible) 99 percent of the time we hear the same thing.[13]

Turk continued to talk to Stasenko while Stasenko was talking to Heffernan. Turk asked whether he could finish getting dressed. Stasenko told him no. He asked whether he could walk through his house. Stasenko told him no. Turk then asked whether he was being detained. Again, Stasenko said no. Ultimately, after being told again that he would go to jail, Turk agreed to stand in his foyer with the officers and stopped asking questions.

As Turk, and later Stasenko, spoke to Heffernan, Mrs. Turk grew increasingly agitated, exclaiming: "Please go search and fucking get out of my house," "I have a ten year old here," and "go through my fucking house and look, okay."

---

[13] Heffernan told Stasenko that Mattice planned to appear at his scheduled arraignment later that day.

Turk's responses varied. Some of his words indicated that he did not consent to the officers' search. As Mrs. Turk grew more agitated, he said: "All right, don't, please talk to me, please talk to me. . . . She's upset." While Stasenko was still on the phone with Heffernan, and when Mrs. Turk began to lead officers around the house, Turk said: "Beth, wait - - would you wait until he's - -" Mrs. Turk cut him off: "Here, they've already started, I'm giving them (inaudible) to get them out of here. Okay. Come on."

But Turk also made comments suggesting that he would allow officers to search. He told Officer Stasenko: "We're going to be very cooperative," and in response to an officer's telling him that his wife consented to the Task Force's "tak[ing] a look, [to] make sure [Mattice is] not here," said: "that's fine." He also offered the officers coffee, and said to his wife: "Beth, they're just doing their job, they're mistaken."

After Stasenko finished talking with Heffernan, he and Officer Comerford began to ask Turk about his interaction with Mattice. Turk refused to answer, claiming that he could not remember what he did the Friday before. The officers continued to threaten Turk with jail time, telling him: "County jail is a great place to remember things." The officers also tried softer tactics, stating: "if you would just give us the information that we need, we'd leave and your wife would calm down, your house wouldn't be upset like this." But all to no avail. Turk would not give the officers the information they asked for.

Eventually, Heffernan called back or someone called him a second time. This time, he spoke with Comerford, who told him that, if Mattice came to his arraignment, which was scheduled for that day, Turk's involvement in the case would be over. If Mattice did not attend, however, Turk would

have to come to the police station with Heffernan and talk to the officers. Soon after this conversation ended, the officers left the house. The entire encounter took approximately thirty minutes.

On April 17, 2009, the Turks filed this lawsuit, alleging violations of state and federal law. The United States filed a Notice of Substitution and Motion to Dismiss for Failure to Exhaust Mandatory Administrative Remedies under the Federal Tort Claims Act, 28 U.S.C. § 1346. The Turks sought, and received, leave to amend their complaint. The amended complaint omitted all of the first complaint's common-law tort claims, and added the Cuyahoga Metropolitan Housing Authority as a party. In the amended complaint, the Turks alleged that the officers' search was unconstitutional under state and federal law, that the Cuyahoga County Sheriff and Cuyahoga Metropolitan Housing Authority failed to train the Task Force adequately, that the same two municipal parties maintained illegal policies and customs, and that the individual officers were liable under *Bivens*.

Later, the Turks voluntarily dismissed their claims against the municipal parties and Chapman. After discovery on the remaining claims against the Task Force officers, the United States filed a motion for summary judgment, based on qualified immunity. The district court granted in part and denied in part the motion. First, it held that the Turks' version of the officers' initial entry, if true, would support a finding of liability on Fourth Amendment grounds. The district court reasoned, however, that the Turks' claim based on the Task Force's subsequent search failed because Mrs. Turk gave the officers permission to search, and Mr. Turk's words were not clear enough to

vitiate his wife's express consent. Finally, the district court held that Stasenko did not unreasonably seize Turk, because he detained him in the foyer only incident to a lawful consensual search.

Judge O'Malley, who handled the case initially, was appointed to the Federal Circuit and left the Northern District of Ohio. Judge Polster took over. After this substitution, the United States moved for reconsideration of Judge O'Malley's earlier decision denying the officers qualified immunity for their initial entry. Judge Polster granted the motion. He reasoned that the officers were entitled to qualified immunity because they reasonably believed that Turk consented to their entry when he began to turn the dead-bolt on his door. Judge Polster also disposed of all claims against Comerford and Rexing, reasoning that neither officer was present in the house until after Stasenko, Adams, and Chapman had entered, and both were entitled to assume that their fellow officers acted constitutionally. The Turks appeal.

## II

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There is a genuine issue for trial if "the record taken as a whole could . . . lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We review *de novo* a district court's grant of summary judgment, construing the facts and drawing all reasonable

inferences in the moving party's favor. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

III

"Every person who, under color of . . . [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983, however, does not make government officials liable for every act later held unconstitutional. Rather, "[q]ualified immunity, shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). We need not address these two elements in a particular order. *Ibid.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)).

Because qualified immunity is an affirmative defense, the defendant bears the burden of pleading it in the first instance. *Lanman v. Hinson*, 529 F.3d 673, 683 (6th Cir. 2008); *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). Once the defendant raises qualified immunity, however, the burden shifts to the plaintiff, who must demonstrate both that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation "that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 131 S. Ct. at 2083 (internal quotation marks omitted). If the plaintiff fails to establish either element, the defendant is immune from suit.

IV

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. It has long been clear that, under this Amendment, an officer may not search for a person named in an arrest warrant in a third-person's house, unless the officer has a search warrant, obtains consent, or faces exigent circumstances. *Steagald v. United States*, 451 U.S. 204, 216 (1981). Because the Task Force officers violated this right, the Turks allege, they are amenable to suit under § 1983.

Without question, Task Force officers had no warrant to search Turk's house. Nor do they claim that exigent circumstances justified their actions. Rather, Appellees argued below, and maintain here, that they did not violate the Fourth Amendment because the Turks consented to the officers' entering, and then searching, their home.

"While the Fourth Amendment protects citizens against unreasonable searches and seizures, a search of a person is not unreasonable if that person gives free and voluntary consent." *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011). "The notion of voluntariness," the Supreme Court has observed, "is itself an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes." *Culombe v. Connecticut*, 367 U.S. 568, 604–05 (1961) (Frankfurter, J.). Complex though voluntariness may be, there are guideposts that help us determine whether an individual consented to an officer's search of his own free will.

We consider consent voluntary only if "it is unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (internal quotation omitted). In determining whether this is so, we analyze the totality of the

circumstances, including "both the characteristics of the [consenting individual] and the details of the [search]." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). We therefore take into account "the age, intelligence, and education of the [consenting] individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *Beauchamp*, 659 F.3d at 572. We also consider whether the officer advised the consenting individual of his constitutional rights, how long the search took, and whether the officer used physical punishment, *Bustamonte*, 412 U.S. at 226, or some "more subtle form[] of coercion that might flaw [the consenting individual's] judgment." *United States v. Watson*, 423 U.S. 411, 424 (1976).

Here, we consider two discrete Fourth Amendment events: the officers' initial entry and their subsequent search.

### The Entry

As Turk went to find his daughter, he saw cars and men in hats outside of his house. He then heard someone pounding on his door with a heavy object and telling him that, unless he opened the door, he was "fucking going to jail right now." According to Turk, whose account we must credit at this stage, Task Force officers then attempted to break down the "dummy" side of his front door. Moments later, as he began to turn the deadbolt on the side of the door that opened, the left-hand side, Task Force officers pushed the left-hand door open, causing it to splinter, and rushed into the house.

Turk's account, if true, describes a textbook Fourth Amendment violation. "It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth

Amendment is directed," *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (internal quotation omitted);

*see also Payton v. New York*, 445 U.S. 573, 587 (1980) ("Freedom from intrusion into the home or

dwelling is the archetype of the privacy protection secured by the Fourth Amendment.") (quoting

*Dorman v. United States*, 435 F.2d 385, 389 (D.C. Cir. 1970) (Leventhal, J.)). This "overriding

respect for the sanctity of the home . . . has been embedded in our traditions since the origins of the

Republic." *Id.* at 601. Indeed, as then-future Prime Minister Pitt the Elder put it:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!

*Miller v. United States*, 357 U.S. 301, 307 (1958) (quoting The Oxford Dictionary of Quotations 379

(2d ed. 1953)).[14]

Here, law-enforcement officers, without a warrant, consent, or any exigent circumstance,

literally forced their way into the Turks' home, arrogating to themselves powers beyond those of the

King of England. True, Turk's turning the deadbolt may have shown that he was willing to talk with

---

[14] Most believe that this quotation comes from a March 1763 speech to the House of Commons on an excise tax. No reliable records, however, substantiate this attribution. There are no contemporaneous records of House of Commons debates until 1771. There is a historical record of a 1763 debate on the "Cyder Tax," however, which reads: "Mr. *Pitt* spoke against this measure, particularly against the dangerous precedent of admitting the officers of excise into private houses. Every man's house was his castle, he said." 15 Parliamentary Hist. Eng. 1307 (1763) (available at http://www2.odl.ox.ac.uk/gsdl/cgi-bin/library?e=d-000-00---0modhis06--00-0-0-0prompt-10---4------0-1l--1-en-50---20-about---00001-001-1-1isoZz-8859Zz-1-0&a=d&c=modhis06&cl=CL1&d=modhis006-aao.2.15.1.40 (last visited 7/13/12)).

the officers face-to-face.[15]   But, without more, there is nothing about unlocking a door that demonstrates consent—"unequivocal, specific and intelligently given," *Moon*, 513 F.3d at 537—to an officer's *entry* into a home.  *Cf. United States v. Carter*, 378 F.3d 584, 589 (6th Cir. 2004) (en banc) (holding that stepping aside from doorway leaving officers clear path to enter, after being asked for consent to search, was valid consent).

But even if Turk did mean to consent by beginning to unlock the door, a reasonable factfinder could conclude that the officers' threatening jail time and pounding on the door so hard that the glass shook was coercive and therefore vitiated any consent that Turk gave.  Indeed, we have found coercion in significantly less trying circumstances.  *See Beauchamp*, 659 F.3d at 572 (holding that officers coerced suspect into consenting by failing to inform him of his right to refuse search and asking for consent during frisk for weapons); *United States v. Tatman*, 397 F. App'x 152, 164–66 (6th Cir. 2010) (holding that consent to search house, given by domestic-violence victim pursuant to signed consent form, was invalid because officers told her that it would be in her best interest to sign form and victim saw abusive husband handcuffed and placed in police cruiser); *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (holding that plain-clothes officers obtained consent coercively by asking for permission to search bag, without detention, threat, or speech above conversational tone, since suspect responded: "You've got the badge, I guess you can."); *United States v. Tillman*, 963 F.2d 137, 143–44 (6th Cir. 1992) (holding that consent was involuntary because police told suspect that he was not free to leave and that search warrant would take two to

---

[15] Such a conversation, of course, could take place through a door cracked open, or on Turk's front porch.

three hours to obtain); *cf. United States v. Bond*, 433 F. App'x 441, 443 (6th Cir. 2011) (holding that officer's telling suspect that he would get a search warrant for hotel room did not make officers' request to enter hotel room coercive). Thus, even if Turk's turning the deadbolt were an act of consent (which we hold that it was not), that consent was a product of coercion. Under either analysis, the Task Force officers' initial entry violated the Fourth Amendment.

The district court on reconsideration reached, and the officers urge, a different conclusion. The district court reasoned that, because Turk began to turn the deadbolt after the officers knocked on the door, and because the Turks did not object to the officers' entry after they pushed the door open, an objectively reasonable officer in Stasenko's position could have believed that "the Turks gave implied consent to enter their home." Likewise, the officers argue that the Turks provided "nothing . . . to demonstrate that a reasonable officer would not believe consent to enter was implied from the circumstances or to rebut Stasenko's assertion that he reasonably believed he had consent to enter." Appellees' Br. at 33.

The district court erred and the officers are mistaken. Of course, it is possible to give consent by conduct. *See, e.g.*, *United States v. Hinojosa*, 606 F. 3d 875, 882 (6th Cir. 2010) (holding that consent does not have to be verbal to be valid); *Carter*, 378 F.3d at 589 ("Carter asks us to hold as a matter of law that consent must be given verbally . . . this we decline to do. Although a man's home is his castle, trumpets need not herald an invitation. The police may be kept out or invited in as informally as any other guest."). But that conduct, like any other kind of consent, must unequivocally and specifically convey a message of consent, intelligently given and uncontaminated by duress or coercion. *Moon*, 513 F.3d at 537.

Turk's beginning to move the deadbolt, after being told that he would go to jail if he did not let the officers in, satisfies none of these criteria. It is, at best, an ambiguous gesture in response to a direct threat of imprisonment. Indeed, if Stasenko had truly believed that Turk's turning the deadbolt was an act of consent, he had no reason to push the door open, rather than waiting for Turk to finish opening it. Nor does the Turks' failure to object *after* the unconstitutional entry bear on this conclusion. The issue that we must decide is whether a reasonable officer in Stasenko's shoes could have interpreted Turk's beginning to turn the deadbolt as consent to entry. That the Turks did not object once the officers entered may be relevant to the factfinder, charged with deciding which version of events to accept. But it does not affect our analysis, which turns only on what Stasenko knew when he entered the home. In the totality of the circumstances, it was not objectively reasonable to interpret Turk's beginning to turn a deadbolt as an unequivocal and uncoerced invitation to enter.

This conclusion makes the second piece of the qualified-immunity analysis relatively simple. Officer Stasenko violated Turk's right to be free from a warrantless search of his home for Mattice, absent consent or exigent circumstances. The Supreme Court's holding in *Steagald* clearly established this right in 1981. *Steagald*, 451 U.S. 204. The officers who broke down Turk's door are not entitled to qualified immunity for their entry.

The Search

That the officers' entry violated clearly established Fourth Amendment law, however, does not mean that the same is necessarily true of their subsequent search. *See Evans v. Vinson*, 427 F. App'x 437, 444 (6th Cir. 2011) (explaining that "doctrine[s] relating to the exclusionary rule . . . do[]

not speak to the legality of the search itself and [are] thus inapplicable to the § 1983 context.");

*Chatman v. Slagle*, 107 F.3d 380, 382 (6th Cir. 1997). Rather, the search was an independent Fourth

Amendment event, subject to independent Fourth Amendment analysis. As before, the Turks claim

that the officers violated their right to be free from a warrantless search of their home for Mattice,

absent consent or exigent circumstances. As before, the Task Force officers claim that an objectively

reasonable officer could have believed that he had consent to search the house, and that qualified

immunity is, therefore, appropriate.

The same general Fourth Amendment principles apply. An officer may not conduct a

warrantless search for a person named in an arrest warrant in a third-person's house without exigent

circumstances or consent that "is unequivocal, specific and intelligently given, uncontaminated by

any duress or coercion." *Moon*, 513 F.3d at 537 (internal quotation omitted). To determine whether

an officer had such consent, we examine the totality of the circumstances, taking into account

relevant characteristics of both the consenting individual and the request to search. *Bustamonte*, 412

U.S. at 226; *Beauchamp*, 659 F.3d at 572.

The burden to demonstrate that consent was voluntary "is not satisfied by showing a mere

submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). And

consent coercively obtained, whether by trickery, *see Bumper v. North Carolina*, 391 U.S. 543,

548–49 (1968) (holding that search of sixty-six-year-old woman's home was unconstitutional

because officers obtained consent by claiming, falsely, that they had a warrant), by "demanding

admission to make search of [a home] under government authority," but without a warrant or exigent

circumstance, *Amos v. United States*, 255 U.S. 313, 317 (1921), or by openly threatening conduct,

*Kaupp v. Texas*, 538 U.S. 626, 631–32 (2003) (per curiam) (holding that consent to seizure was not valid where group of officers woke adolescent in the middle of the night "with the words we need to go and talk." (internal quotation marks omitted)), is no consent at all for Fourth Amendment purposes. "A suspect's knowledge of a prior illegal [act] can also give rise to a sense of futility," and vitiate consent. *United States v. Haynes*, 301 F.3d 669, 683 (6th Cir. 2002) (citing *United States v. Furrow*, 229 F.3d 805, 814 (9th Cir. 2000), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001)); *Beauchamp*, 659 F.3d at 572.

With the house surrounded, Turk's liberty threatened, and the front door splintered, Mrs. Turk allowed the Task Force to search her home. As soon as the Task Force officers entered, she said: "Go through the entire house. . . . Get your people out of my front lawn." Later, she asked that the officers "[p]lease go search and fucking get out of my house," and led them through "to get them out of here."

Turk was not so definitive. When Mrs. Turk first consented to search, his immediate reaction was: "Wait a minute. Wait a minute. Wait a minute." As Mrs. Turk began to lead officers around the house, he said to the officers: "Please talk to me. Please talk to me. . . . She's upset," and to his wife: "Wait a minute, wait. Wait until he's done talking to Ed [Heffernan]," and "Beth, wait - - would you wait until he's - - " However, Turk also told Officer Stasenko: "We're going to be very cooperative," and in response to an officer's telling him that his wife consented to the Task Force's "tak[ing] a look, [to] make sure he's not here," said: "that's fine." He also offered the officers coffee, and said to his wife: "Beth, they're just doing their job, they're mistaken."

- 19 -

After breaking down the door and barging into the Turks' home, no reasonable officer could have believed that the Turks' subsequent consent[16] was voluntary. Rather, the coercion inherent in the totality of the circumstances—the surrounded home, the unequivocal threats of imprisonment, the splintered door, the ten-year-old daughter in a back bedroom—would have put any reasonable officer on notice that the Turks' consent was not freely given.[17] Task Force officers are not entitled to qualified immunity for the search that followed their illegal entry.

V

Turk also claims that Officer Stasenko violated his Fourth Amendment rights by physically detaining him in the foyer. The district court dismissed this claim, pursuant to *Michigan v. Summers*, 452 U.S. 692 (1981) (holding that officers may detain occupants present during execution of a valid

---

[16] In reaching our conclusion, we assume *arguendo* that the Turks did, in fact, ostensibly consent to the officers' search. We do not decide whether Mrs. Turk's leading the officers around the house, despite Mr. Turk's somewhat inconsistent protests, qualified as consent, in light of *Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (holding that, when two occupants have joint control over a home and the police seek consent to search, "a physically present co-occupant's stated refusal . . . prevails [over the other occupant's consent], rendering the warrantless search unreasonable and invalid as to him.").

[17] Consider, for instance, an officer who approaches a person sitting on his front porch. With no reasonable suspicion, much less probable cause, the officer draws his gun, presses it against the person's head and demands consent to enter the person's home. Once inside, the officer holsters his gun and politely asks for consent to search, which the person gives. Of course, in isolation, the officer's second request is not particularly coercive. But the person's consent to the officer's search of the home is still invalid because the officer's earlier coercive tactics linger in the totality of the circumstances.

search warrant).[18]  But since we hold that the officers' entry and search were invalid, we consider

this claim on its merits.  *See Johnson v. Hayden*, 67 F. App'x 319, 324 (6th Cir. 2003).

"The Fourth Amendment protects the right of the people to be secure in their persons against

unreasonable seizures.  This protection, however, applies only if a person is 'seized' within the

meaning of the Fourth Amendment." *United States v. Williams*, 615 F.3d 657, 663 (6th Cir. 2010)

(internal citations and alterations omitted).  "[N]ot all personal intercourse between policemen and

citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show

of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has

occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  An "encounter between a police officer and

a citizen [qualifies as] a seizure or detention within the meaning of the Fourth Amendment, if, in

view of all the circumstances surrounding the incident, a reasonable person would have believed that

he was not free to leave." *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984).

> Examples of circumstances that might indicate a seizure, even where the person did
> not attempt to leave, would be the threatening presence of several officers, the
> display of a weapon by an officer, some physical touching of the person of the
> citizen, or the use of language or tone of voice indicating that compliance with the
> officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 555 (1980).  "Once a consensual encounter escalates to

the point where the individual is 'seized,' the police officer must have a reasonable suspicion of

criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure

---

[18] The district court noted that courts in other circuits have applied the holding of *Summers*
to consent searches.

to comply with the Fourth Amendment." *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007).[19]

Stasenko physically detained Turk, grabbing him by his wrist to keep him in the foyer and away from his wife. When Turk asked to finish getting dressed, Stasenko told him no—compelling him to stay in the foyer by threatening him with jail time. Nothing in the record suggests that Stasenko had reasonable suspicion or probable cause to justify his actions. And, of course, it has been clearly established, at least since *Terry*, that a seizure not justified by probable cause or reasonable suspicion violates the Fourth Amendment. Qualified immunity is not appropriate for Turk's illegal-detention claim.

VI

The district court on reconsideration held that Rexing and Comerford could not be liable because they did not enter until after Stasenko, Adams, and Chapman, and because law-enforcement officers may generally assume that other officers have acted lawfully. *See Sargent v. City of Toledo Police Dep't*, 150 F. App'x 470, 474 (6th Cir. 2005) (explaining that "no Fourth Amendment violation occurs when an officer follows a partner inside after the partner has already entered the home," unless "there is [some] indication either that [the officer] ordered [the partner] to enter the house illegally or that [the officer] knew that [the partner] entered the home without consent"). This conclusion was correct as to Comerford. In his deposition, Turk explained that Comerford did not enter until Stasenko called him on the radio in response to Turk's calling Heffernan. Nor did Turk

---

[19] *Summers*, 452 U.S. 692, of course, carves out an exception to this general rule.

specifically allege that Comerford did anything, other than speak to him in person, and to Heffernan on the phone. There is no indication, in short, that Comerford personally participated in any unconstitutional conduct. The district court was correct to hold that the Turks' claims against Comerford must fail.

Rexing is a different story. There is dispute in the record over when Rexing entered. Turk's deposition testimony suggests that Rexing was in the home early in the incident, even though Turk claimed that he could not remember which other officers entered with Stasenko. *Id.* at 93. In his later-produced affidavit, Turk averred that Rexing entered with Stasenko, Adams, and Chapman. Rexing, by contrast, swore in his affidavit that, when he came inside, "Stasenko, Adams, and Chapman were in the foyer with James and Mary Beth Turk." This is a genuine issue of material fact, not amenable to resolution on summary judgment.[20] The district court erred by dismissing the Turks' entry and search claims against Rexing, even though, as we discuss below, the Turks' breach-of-curtilage claims against Rexing fail.[21]

---

[20] It is true that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). But Turk's affidavit is not inconsistent. Rather, he testified in his deposition that Rexing was inside "harassing [his] family" early in the incident, while Stasenko was detaining him in the foyer, and later claimed that Rexing entered with Stasenko. These two statements are complementary, not contradictory.

[21] Of course, at trial the Turks must prove that Rexing, himself, acted unconstitutionally, for "[t]his Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Heyne v. Nashville Metro. Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) (quoting *Lanman*, 529 F.3d at 684).

VII

Finally, the Turks claim that Task Force officers violated the Fourth Amendment by breaching the curtilage of their home. A house's curtilage is an area "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 652 (6th Cir. 2006) (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)). A law-enforcement officer may enter a home's curtilage without a warrant if he has a legitimate law-enforcement objective, and the intrusion is limited. *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006). Unquestionably, one such permissible intrusion is a "knock and talk," an investigative technique where an officer knocks on the door of a house to engage the person inside in conversation. *Hardesty*, 461 F.3d at 653. Also, "where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." *Id.* at 654.

What is not clear is whether officers' surrounding a house, with no warrant, exigent circumstances, or consent, violates the Fourth Amendment, even during a knock-and-talk. Very few cases address this issue, and what little law exists is not consistent. *Compare United States v. Butler*, No. 06-CR-215, 2007 WL 2220260, at *8 (E.D. Wis. Aug. 1, 2007) (holding that surrounding house during knock-and-talk was justified by legitimate law-enforcement purpose where officers had reason to believe that large quantities of heroin were present), *with United States v. Berry*, 468 F. Supp. 2d 870, 880 (N.D. Tex. 2006) (holding that entry onto curtilage could not be justified as knock-and-talk, where "[t]here were at least eight officers present. The officers carefully planned the

operation, staked out their positions surrounding Berry's house, and took cover positions. Four officers entered Berry's patio and approached the front door."). In this scenario, the officers are entitled to qualified immunity, since Turk's right not to have officers surround his house during a knock and talk is not so clearly established "that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 131 S. Ct. at 2083 (internal quotation marks omitted).

VIII

In sum, we REVERSE the district court's grant of summary judgment on the Turks' Fourth Amendment entry, search, and seizure claims. We also REVERSE the district court's grant of summary judgment for Rexing, but AFFIRM its grant of summary judgment for Comerford, and its disposition of the Turks' breach-of-curtilage claim. We REMAND for proceedings consistent with this opinion.