RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0325p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

                    *Plaintiff-Appellee*,

     *v.*

LEE EDWARD BLOMQUIST,

                 *Defendant-Appellant*.

Nos. 19-2111/2112

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:17-cr-00031-1—Paul Lewis Maloney, District Judge.

Decided and Filed:  October 7, 2020

Before:  BOGGS, STRANCH, and THAPAR, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:**  Elizabeth LaCosse, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Marquette, Michigan, for Appellant.  Paul D. Lochner, UNITED STATES ATTORNEY'S OFFICE, Marquette, Michigan, for Appellee.

─────────────────

**OPINION**

─────────────────

THAPAR, Circuit Judge.  Lee Blomquist manufactured and distributed marijuana in Michigan's Upper Peninsula.  When the police arrived with a search warrant, Blomquist claimed his growing operation was legal and gave the officers a tour.  But there was a problem:  It wasn't.  So Blomquist was charged with various federal drug crimes.  He pled guilty to distributing and conspiring to distribute marijuana, and a jury convicted him of manufacturing and possessing with intent to distribute between 50 and 100 marijuana plants.

Blomquist now appeals, arguing that the police exceeded the scope of the search warrant. But since Blomquist consented to the more expansive search, we affirm.

I.

Blomquist was storing marijuana on his father's property. The police got a warrant to search that property after watching the suspicious comings and goings of a drug dealer. The warrant permitted a full search of the property, including any outbuildings found within its curtilage.

When officers arrived, they encountered Blomquist walking out of a nearby chicken coop and placed him in handcuffs. The officers then advised him of his rights, and he waived them and agreed to talk. He was "very cooperative," and at some point the officers removed his handcuffs. R. 45, Pg. ID 164.

Blomquist claimed he was running a legal medical-marijuana operation and offered to show the officers his paperwork. He took the officers to his father's garage and gave them a binder of materials, which he said authorized a medical-marijuana operation.

The officers asked Blomquist if he would show them where the marijuana was being grown, and he said he would. He then led the officers back to the chicken coop, brought them inside, and showed them five small rooms with scores of marijuana plants. He explained that he moved the marijuana plants from the chicken coop to nearby greenhouses in warmer weather; naturally, he took the officers there next. At no point during this interaction did Blomquist suggest that the structures were on someone else's property, nor was there any visible evidence—such as a fence, barrier, or tree line—indicating as much.

The officers asked Blomquist where he stored the processed marijuana, and the tour continued. He brought them back to his father's garage, pulled down a ladder, and led them up to a locked room in the attic. He unlocked the door and let them in. The room contained around 37 pounds of marijuana, pre-packaged into baggies.

As it turns out, Blomquist's medical-marijuana operation wasn't legal—not even under Michigan law. To start, Blomquist was categorically forbidden from distributing medical

marijuana in the State because he had a federal drug felony on his record. *See* Mich. Comp. Laws § 333.26423(k) (2016). But even if he could run a legal operation, his was too big: He stored more marijuana on his father's property than distributors were allowed to possess. And if that wasn't enough, he admitted to selling marijuana to a drug dealer (who lacked a medical-marijuana card).

Blomquist had also broken a host of federal laws, and federal prosecutors charged him with manufacturing, possessing, distributing, and conspiring to distribute marijuana. 21 U.S.C. §§ 841, 846. Blomquist moved to suppress the evidence obtained during the search. At the suppression hearing, Blomquist established that the chicken coop and greenhouses were on his cousin's property, which he leased and which was not covered by the search warrant. He argued that the officers knowingly exceeded the scope of the warrant.

Because Blomquist "voluntarily consented to the search of the premises by giving the . . . detectives a tour of his operation," the district court denied the motion. R. 41, Pg. ID 104–05. Blomquist now appeals.

## II.

Blomquist contends that the officers violated his Fourth Amendment rights when they searched the chicken coop and greenhouses on the property he leased. The government does not dispute that Blomquist had a property interest in the structures and that the warrant did not cover them. Instead, it argues that Blomquist consented to the more expansive search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

Since consent is a question of fact, we look at the evidence in the light most favorable to the government and reverse only for clear error. *United States v. Collins*, 683 F.3d 697, 701–02 (6th Cir. 2012); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Thus, we will uphold a finding of consent to a warrantless search unless we are left with a "definite and firm conviction that a mistake has been committed." *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (citation omitted).

For consent to be valid, it must be "free and voluntary." *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002) (citation omitted). "The government bears the burden of demonstrating by a preponderance of the evidence, through clear and positive testimony, that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020) (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009)).

So we ask two questions: (1) whether an individual's "actions adequately demonstrated consent," and (2) whether "other factors contaminated" that consent. *United States v. Bond*, 433 F. App'x 441, 443 (6th Cir. 2011). It is to those issues that we now turn.

A.

First, did Blomquist's actions demonstrate consent? In short, yes. After the police secured Blomquist and informed him of his rights, he volunteered to show them his medical-marijuana papers. The police examined the papers and asked Blomquist if he would show them his growing operation. He agreed and, as Blomquist's counsel put it, "took the police around" the property. R. 167, Pg. ID 866.

Blomquist led, and the officers followed. The officers never forced their way into the outbuildings, told Blomquist they would go in without his permission, or stated that their warrant enabled such a search. Indeed, a magistrate judge aptly described Blomquist as giving the officers "a tour of his operation." R. 41, Pg. ID 95. Not only did Blomquist consent to the search, he practically directed it.

B.

The second question we must ask is whether other factors contaminated Blomquist's consent. We determine whether consent was voluntary by looking at the totality of the circumstances. *Collins*, 683 F.3d at 702. We consider factors as varied as "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of

detention; and the use of coercive or punishing conduct by the police." *Elkins*, 300 F.3d at 647 (citation omitted).

Blomquist contends that his consent was not voluntary because he was detained when the police arrived and because the police improperly relied on the warrant. The district court disagreed, and so do we.

For starters, although Blomquist was briefly detained as law enforcement officials secured his father's property, he was quickly given a *Miranda* warning. *See Miranda v. Arizona*, 384 U.S. 436 (1966). He was thus fully aware that anything he shared with the officers could be used against him. And still, he led the officers on a tour of the chicken coop and greenhouses, explaining in detail how his growing operation worked. While the officers did *ask* Blomquist if he would show them where he grew his marijuana, they did not force him to do so or threaten him in any way.

What's more, Blomquist was cooperative from the get-go. Why? Because—as his attorney explained at the sentencing hearing—he thought his operation was (mostly) legal under Michigan's medical-marijuana laws. The record contains no sign that Blomquist so much as hesitated before showing the officers the outbuildings. And a suspect's cooperation supports a finding of voluntary consent. *Elkins*, 300 F.3d at 648–49.

Finally, the record contains no reason to think that Blomquist was uniquely susceptible to duress or coercion. Blomquist was 46 years old at the time of his arrest. He had received a high-school diploma and was trained as an electrician. After presiding over Blomquist's trial, the district court described him as "a very intelligent individual." R. 167, Pg. ID 879. Blomquist also had an extensive criminal history, giving him ample experience with the police and legal system. Indeed, in 2002, he was convicted of manufacturing more than 100 marijuana plants on this very property. Based on Blomquist's personal characteristics and history with law enforcement, there is no reason to think his consent was the product of duress or coercion.

Blomquist raises two primary counterarguments. First, he suggests that his consent was tainted by the presence of a tactical law-enforcement unit and the officers' initial decision to handcuff him. But these factors do "not appear to have influenced [Blomquist's] actions in any

significant manner." *Bond*, 433 F. App'x at 445.  Although the law enforcement officers donned tactical gear and placed Blomquist in handcuffs while they secured the scene, they did not mistreat him, threaten him, or act unprofessionally.  To the contrary, they immediately secured his belongings and read him his *Miranda* rights.  Blomquist then spoke cooperatively with the officers, and—at some undetermined point during the search—the officers removed his handcuffs.  Evaluated on the whole, the officers' conduct did not taint Blomquist's consent.

Second, Blomquist raises several related arguments about the effect of the warrant.  For instance, he contends that because the officers arrived with a warrant, he was coerced.  But as the district court correctly noted, "the record does not indicate when, or even if, the officers ever informed Defendant that they had a search warrant before he voluntarily took the officers to the chicken coop."  R. 53, Pg. ID 264.  Indeed, one of the officers testified that he never "got to [the] point" of demanding that Blomquist comply with the search warrant and show them the chicken coop, because Blomquist was "willing and wanted to take [them] there."  R. 45, Pg. ID 180.  Blomquist concedes as much in his appellate brief.  Under these circumstances, the district court did not clearly err in holding that the warrant did not coerce Blomquist.  *See Hill*, 195 F.3d at 264.

Blomquist also argues that his consent was tainted because the officers initially violated the warrant by detaining him on his cousin's property.  But exceeding the scope of a search warrant does not automatically render consent non-voluntary.  We must instead look at the overall circumstances to determine whether any alleged violation affected the voluntariness of consent.  Here, the chicken coop was close to the property line, and the record does not definitively establish where the arrest took place—on Blomquist's father's property (covered by the warrant) or on his cousin's property (not covered by the warrant).  So the location of the arrest does little to change our analysis of the "overall context and psychological impact of the entire sequence of events."  *United States v. Jones*, 846 F.2d 358, 361 (6th Cir. 1988) (per curiam).

In sum, the totality of the circumstances shows that Blomquist's consent was voluntary. When the officers arrived, Blomquist sized up the situation, decided he was best off cooperating, and consented to the search of the chicken coop and greenhouses. His Fourth Amendment rights were not violated, and the district court correctly denied his motion to suppress.

We affirm.