RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0199p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NEIL A. MORGAN II; ANITA L. GRAF,

　　　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

FAIRFIELD COUNTY, OHIO, et al.,

　　　　　　　　　*Defendants-Appellees*.

No. 17-4027

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:15-cv-01505—Edmund A. Sargus Jr., District Judge.

Argued: May 2, 2018

Decided and Filed: September 6, 2018

Before: DAUGHTREY, STRANCH, and THAPAR, Circuit Judges.

---

## COUNSEL

**ARGUED:** Edward R. Forman, MARSHALL AND FORMAN LLC, Columbus, Ohio, for Appellants. Paul M. Bernhart, FISHEL HASS KIM ALBRECHT DOWNEY LLP, New Albany, Ohio, for Appellees. **ON BRIEF:** Edward R. Forman, John S. Marshall, MARSHALL AND FORMAN LLC, Columbus, Ohio, for Appellants. Paul M. Bernhart, Daniel T. Downey, FISHEL HASS KIM ALBRECHT DOWNEY LLP, New Albany, Ohio, for Appellees.

　　　DAUGHTREY, J., delivered the opinion of the court in which STRANCH, J., joined, and THAPAR, J., joined in part. STRANCH, J. (pp. 15–16), delivered a separate concurring opinion. THAPAR, J. (pp. 17–28), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Neil A. Morgan II and Anita L. Graf sued Fairfield County, Ohio, three of its officials, and five members of its sheriff's department under 42 U.S.C. § 1983, claiming Fourth Amendment violations.  Specifically, Morgan and Graf alleged that individual officers of the county's SCRAP unit—Street Crime Reduction and Apprehension Program—violated their Fourth Amendment rights when they surrounded Morgan's and Graf's house, without a warrant or exigent circumstances, in order to perform a 'knock and talk.'[1]  They also claimed that the county violated their Fourth Amendment rights by making such illegal entries of property a policy or practice.  The district court granted the defendants' motion for summary judgment in full.  The district court was correct to conclude that the law was not clearly established, so that the claims against the individual officers failed on qualified immunity grounds.  The district court was wrong, however, to conclude that the county was not liable for injuries caused by a policy that directed officers to make warrantless entries onto constitutionally protected property with no regard for—or even recognition of—constitutional limits.  For these reasons, we affirm in part and reverse in part.

**BACKGROUND**

Morgan and Graf owned a home together on about a one-acre lot.  The front of the house faced the road, and a sidewalk ran from the road to their front door.  In the front window and on a vehicle parked on the property were no-trespassing signs.  There were neighboring homes—each approximately 300 feet away.  At the time of the events of this case, one of the neighboring houses was occupied; the other was empty.  There were only limited sightlines between the houses and no residences across the street or behind Morgan's and Graf's house.

In the back of the house there was a second-story balcony that was not visible from the front of the residence.  There were no stairs to the balcony, so that the only way to access it was

---

[1]A 'knock and talk' is an investigative technique in which police, without a warrant, knock on a suspect's door and ask to speak with the suspect or for consent to search.  *See United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005).

through the house. On one side of the balcony was a privacy fence, blocking the view to the one neighbor's house that was occupied. On the other side, large trees blocked the view to the unoccupied neighboring house.

The county's SCRAP unit received two anonymous tips that Morgan and Graf were growing marijuana and cooking methamphetamine at their house. The SCRAP unit was familiar with Morgan and Graf; they had conducted a 'knock and talk' a year earlier and let Morgan and Graf off with a warning. The two new tips were not sufficient to establish probable cause for a warrant, however, and so the SCRAP unit decided to do another 'knock and talk.'

Five members of the SCRAP unit went to the house and, following their standard practice, surrounded the house before knocking on the door. One officer was stationed at each corner of the house, and one approached the front door. The officers around the perimeter were standing approximately five-to-seven feet from the house itself. The officers forming the perimeter could see through a window into the house on at least one side of the building.

With the officers in position, the officer at the front door—Deputy Lyle Campbell—knocked and spoke briefly with Graf. Graf shut the door, remaining inside.[2] While Campbell was speaking with Graf, one of the officers positioned in the back of the house noticed seven marijuana plants growing on the second-floor back balcony and notified the other members of the SCRAP unit. By the time Campbell learned of the plants, Graf already had closed the front door. Fearing destruction of evidence, Campbell then demanded that Graf return and open the door. Almost immediately after voicing that demand, he opened the door, entered the house, and brought Morgan and Graf outside to wait for a search warrant.

An Ohio court issued a search warrant based on the officers' observation of the marijuana plants. During the ensuing search, the police found weapons, drugs, and drug paraphernalia. Morgan and Graf were arrested and charged in state court. The trial court denied Morgan's and Graf's suppression motion, after which Morgan pleaded guilty and Graf was found guilty by a

---

[2]Although the parties dispute why Graf closed the door, no one disputes that she did. Graf insists that Campbell put his foot across the threshold and she told him that if he did not have a warrant he would have to leave. Campbell, on the other hand, stated that Graf closed the door so that she could lock up her dog. The factual discrepancies are immaterial—the case is about the officers around the perimeter, not the officer at the front door.

jury.   On appeal, however, the denial of the suppression motion was overturned and the convictions vacated.  The State of Ohio subsequently dropped the charges.

**The proceedings below**

After the dismissal of the charges, Morgan and Graf filed this 42 U.S.C. § 1983 action, alleging violations of their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures.  They sued four members of the SCRAP unit in both their individual and official capacities, and they sued two Fairfield County commissioners and the Fairfield County sheriff in their official capacities.  They also sued the county itself.

Morgan and Graf alleged that forming a perimeter around the house intruded on their curtilage, an area protected by the Fourth Amendment.  What is more, the intrusion was not a one-time event—it was the county's policy to do so during every 'knock and talk.'  On cross-motions for summary judgment, the district court dismissed all of the claims.

First, addressing the claims against the officers in their individual capacities, the district court concluded that the officers were entitled to qualified immunity.  Specifically, the court held, qualified immunity was appropriate because even if intruding onto the curtilage violated the Fourth Amendment, it was not clearly established that such an action was a violation at the time of the 'knock and talk'—June 19, 2012.  The district court relied on the unpublished decision in *Turk v. Comerford*, 488 F. App'x 933 (6th Cir. 2012), which this court had issued a month after the 'knock and talk' incident at issue here.  In *Turk*, police had surrounded a home for a 'knock and talk' because they believed that a dangerous fugitive was inside.  *Id.* at 935.  The *Turk* panel looked to the opinion in *Hardesty v. Hamburg Township*, 461 F.3d 646 (6th Cir. 2006), which recognized that curtilage gets Fourth Amendment protection but concluded that officers may intrude on curtilage to look for someone during a 'knock and talk' *if* they have indications that someone is inside and just not answering the door.  Because it was unclear whether the logic of *Hardesty* applied to surrounding a house "with no warrant, exigent circumstances, or consent," the panel in *Turk* concluded that the police were entitled to qualified immunity.  488 F. App'x at 947–48. Relying on *Turk*, the district court here concluded that if the

law was not settled in July 2012, it was not settled in June 2012. Thus, the district court reasoned, the officers were entitled to qualified immunity.

Next, the district court addressed the official-capacity claims and the claim against the county—correctly analyzed as one claim against Fairfield County—and concluded that Morgan and Graf could not meet the standard for municipal liability required by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The court noted that Morgan and Graf could not show that the policy was facially unconstitutional because there could be instances in which the policy would be applied constitutionally. Nor, said the district court, could they satisfy the burden of showing that the county was deliberately indifferent to unconstitutional application of its policy. The district court thus granted summary judgment in favor of all of the defendants on all claims.

## DISCUSSION

**Standard of review**

This court reviews a grant of summary judgment *de novo*. *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998). "In the qualified immunity context, 'this usually means adopting . . . the plaintiff's version of the facts,' unless the plaintiff's version is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013) (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007)). Summary judgment is appropriate only if there is no genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is material if its resolution will affect the outcome of the lawsuit. *Id.* at 248.[3]

**Qualified immunity**

Government officials sued in their individual capacities for constitutional violations are free from liability for civil damages unless (1) they violate a constitutional right that (2) was clearly established at the time that it was violated. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818

---

[3]The county asserts facts in its brief that are not discussed in this opinion because they are immaterial or unsupported in the record. For example, the county outlines overall amounts of various drugs that the SCRAP unit confiscated in 2012; explains how the unit prepared for knock and talks; and even asserts that if the knock-and-talk policy is unconstitutional, the SCRAP unit will have to disband entirely.

(1982). Courts can address these two elements in any order. *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009). And although this decision turns on the second element—whether the law was clearly established—we have the ability, if not the responsibility, to clarify the state of the law in this circuit so that government agents can understand the limits of their power and that citizens will be protected when those limits are transgressed. For that reason, we address both parts of the qualified-immunity analysis.

**Fourth Amendment violation**

"It is well settled" under the Fourth Amendment that a warrantless search is "'*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). That raises two questions: did the SCRAP unit search Morgan's and Graf's property and, if so, did that search fall under one of the exceptions to the warrant requirement?

The answer to the first question is yes, the SCRAP unit searched the property for Fourth Amendment purposes. When the government gains information by physically intruding into one's home, "'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (quoting *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)). But it is not just the physical house that receives the Amendment's protection. The curtilage—the area "immediately surrounding and associated with the home"— is treated as "part of [the] home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984). That is because "'[t]he protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.'" *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (quoting *California v. Ciraolo*, 476 U.S. 207, 212–13 (1986)).

Whether a part of one's property is curtilage generally involves a fact-intensive analysis that considers (1) the proximity of the area to the home, (2) whether the area is within an enclosure around the home, (3) how that the area is used, and (4) what the owner has done to

protect the area from observation by passersby. *United States v. Dunn*, 480 U.S. 294, 301 (1987). But these factors are not to be applied mechanically: they are "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration— whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301. Often that central consideration requires little more than a commonsense analysis because the concept is "familiar enough that it is 'easily understood from our daily experience.'" *Jardines*, 569 U.S. at 7 (quoting *Oliver*, 466 U.S. at 182 n.12).

Under that commonsense approach, the area five-to-seven feet from Morgan's and Graf's home was within the home's curtilage. Even when the borders are not clearly marked, it is "easily understood from our daily experience" that an arm's-length from one's house is a "classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Id.* (quoting *Oliver*, 466 U.S. at 182 n.12). The right to be free of unwarranted search and seizure "would be of little practical value if the State's agents could stand in a . . . side garden and trawl for evidence with impunity." *Id.* at 6. And the right to privacy of the home at the very core of the Fourth Amendment "would be significantly diminished" if the police—unable to enter the house—could walk around the house and observe one's most intimate and private moments through the windows. *Id.*

But not only were the SCRAP unit members positioned on the sides of the house, they were in the backyard, too. Indeed the backyard is where they discovered the marijuana plants, the cause of the injuries alleged by Morgan and Graf. And "the law seems relatively unambiguous that a backyard abutting the home constitutes curtilage and receives constitutional protection." *Daughenbaugh*, 150 F.3d at 603; *see also United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997). That is true especially when, as here, there are no neighbors behind the house and the backyard is not visible from the road.

The county mistakenly focuses its application of the *Dunn* analysis on the backyard balcony itself, arguing that the there is no search because the balcony was not part of the curtilage. But even if the county were correct that a backyard, second-story balcony with no outside access was not part of the curtilage, it would make no difference here, because the

balcony is not what is at issue. The curtilage that the officers are said to have entered is the area surrounding the house, five-to-seven feet from the residence. Regarding that area, the county argues only two points—first that the immediate perimeter surrounding the house was not part of the curtilage because there was no fence enclosing the rear or perimeter of the house and, second, that area was not part of the curtilage because Morgan and Graf had neighbors. Those arguments are belied, however, by *Dunn* and *Jardines* and the "relatively unambiguous" conclusion this court came to 20 years ago in *Daughenbaugh*.

Because the area surrounding Morgan's and Graf's house was curtilage, and curtilage is treated as part of the home for Fourth Amendment purposes, the officers' entry onto the curtilage could be justified only by a warrant or one of the recognized exceptions to the warrant requirement. It is undisputed that the SCRAP unit had no warrant. As for exceptions to the warrant requirement, the county argues that the entry was justified for three reasons. None, however, is convincing.

First, the county argues that forming a perimeter was not unconstitutional because the officers were protecting their own safety. To be sure, officer safety can be an exigency justifying warrantless entry. But "[q]ualification for this exception is not easy" and requires a particularized showing of a risk of immediate harm. *United States v. Purcell*, 526 F.3d 953, 960 (6th Cir. 2008). The only particularized facts that the county offers here are a contested fact, *i.e.*, that Morgan was in a motorcycle gang, and a fact with no citation to the record, *i.e.*, that Morgan may have had a weapon. Without more, the county cannot show "the need for prompt action by government personnel" required to conclude that delay to obtain a warrant "would be unacceptable under the circumstances." *Id.* (quoting *United States v. Rohrig*, 98 F.3d 1506, 1517 (6th Cir. 1996)).

Instead of showing a particular and immediate risk, the county argues that concern for officer safety *generally* allows police to enter the curtilage and form a perimeter. Yet rather than citing a case supporting that position, the county argues that drugs and guns often go together. Maybe. But that is no more than a general statement of correlation; and generic possibilities of danger cannot overcome the required particularized showing of a risk of immediate harm. *See id.* at 961. But, *even if* the officers knew that Morgan had a weapon, "[t]he mere presence of

firearms does not create exigent circumstances." *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994).

What is more, the county's position would create an exception that would swallow the rule. It might be safer for the police to enter the curtilage to form a perimeter; it would certainly be easier to stop someone who might flee by establishing some sort of barrier to that flight. Indeed, many (if not most) Fourth Amendment violations would benefit the police in some way: It could be safer for police without a warrant to kick in the door in the middle of the night rather than ring the doorbell during the day, and peering through everyone's windows might be a more effective way to find out who is cooking methamphetamine (or engaging in any illegal behavior, for that matter). But the Bill of Rights exists to protect people from the power of the government, not to aid the government. Adopting defendants' position would turn that principle on its head.

Next, the county argues that the officers' presence in the backyard was not a search because they were not there for the purpose of executing a search. *Jardines* forecloses that argument. The subjective intent of officers is irrelevant if a search is otherwise objectively reasonable, but subjective intent cannot make reasonable an otherwise unreasonable intrusion onto a constitutionally protected area. *See Jardines*, 569 U.S. at 10. Notably, the county does not attempt to distinguish *Jardines*—in fact it fails to cite it altogether.

Finally, the county argues that the marijuana plants were discovered in plain view. It is a long-standing rule that police do not conduct a search under the Fourth Amendment by seeing something that is in plain view. After all, the Fourth Amendment does not require police to "shield their eyes when passing by a home on public thoroughfares." *Ciraolo*, 476 U.S. at 213. The plain-view exception, however, applies only when "the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed." *United States v. Taylor*, 248 F.3d 506, 512 (6th Cir. 2001). As explained above, the SCRAP unit discovered the marijuana only after entering Morgan's and Graf's constitutionally protected curtilage. The plain-view exception does not apply.

The SCRAP unit was concerned about general drug activity at Morgan's and Graf's house.  But the Fourth Amendment prohibited them from entering the property:  they had no warrant, no exigent circumstances, and no other exception to the warrant requirement.  A 'knock and talk' by police was permitted "precisely because that is 'no more than any private citizen might do.'"  *Jardines*, 569 U.S. at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)).  Thus, the officers' right to enter the property like any other visitor comes with the same limits of that "traditional invitation":  "typically . . . approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."  *Id.*  Certainly, "[a] visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use."  *Id.* at 19 (Alito, J., dissenting).  Neither can the police.  By doing so here, the SCRAP unit violated Morgan's and Graf's Fourth Amendment rights.

**Clearly established law**

Whether the law in this area was clearly established at the time of defendants' actions presents a closer question.  "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 478 (6th Cir. 2014) (brackets omitted) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

In determining the contours of the right, there is a tension between defining the right at too high a level of generality, on one hand, and too granular a level, on the other.  There does not need to be "a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  "The general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  *Id.* at 742.  Nevertheless, "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'"

*United States v. Lanier*, 520 U.S. 259, 271 (1997) (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In all, the most important question in the inquiry is whether a reasonable government officer would have "fair warning" that the challenged conduct was illegal. *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

For centuries, the common law has protected the curtilage of the house. *See Oliver*, 466 U.S. at 180. And the Supreme Court long has held that the curtilage is "considered part of the home itself for Fourth Amendment purposes." *Id.* That means that the police can enter the curtilage on the same terms that they can enter the rest of the home—no more, no less. *See King*, 563 U.S. at 469. Under those long-settled principles, warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357 (footnotes omitted). A reasonable officer thus would understand that without a warrant or an exception to the warrant requirement, entering the curtilage violates a clearly established right.

Despite these long-settled standards, one case from this circuit, although incorrectly decided, requires that we grant qualified immunity. That case, *Turk v. Comerford*, decided within a month of the 'knock and talk' in this case, found that the law was not clearly settled against a factual background that was, in every material way, the same as here. 488 F. App'x at 947–48.

Central to *Turk*'s analysis was our published decision in *Hardesty*, in which we held that "[if] knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable steps to speak with the person being sought out even where such steps require an intrusion into the curtilage." 461 F.3d at 654. *Hardesty*'s extension of the knock-and-talk doctrine was, by its terms, limited to particular circumstances. *Id.* And if our case law ended there, qualified immunity here would be improper. But in *Turk*, this court read *Hardesty* more broadly and reasoned that because some limited intrusions of the curtilage were allowed, it was not clearly established that surrounding a house for a 'knock and talk' was in the category of unacceptable intrusions. 488 F. App'x at 947–48.

Although *Hardesty* and *Turk* are outliers, Morgan and Graf cannot overcome their burden of showing that the law was clearly established at the time of the search in this case. In those two cases, this court should have reaffirmed long-settled Fourth Amendment principles. *Cf. Rogers v. Pendleton*, 249 F.3d 279, 289–90 (4th Cir. 2001) (denying qualified immunity and reasoning that allowing access to curtilage based on reasonable suspicion would "eviscerate the principle of *Oliver* and *Dunn* that the curtilage is entitled to the same level of Fourth Amendment protection as the home itself"). But it did not. And although unpublished cases do not upset the state of the law, in rare instances they can show that members of this court, during the same time period, facing the *exact* same question, did not think the law to be clearly established. And "[i]f judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). For that reason we affirm the district court's grant of qualified immunity to the officers in their individual capacities.

Nevertheless, in light of recent Supreme Court decisions, neither *Hardesty* nor *Turk* remains good law. *See, e.g.*, *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 234–35 (6th Cir. 2003). *Jardines* and, more recently, *Collins* made clear that, outside of the same implied invitation extended to all guests, if the government wants to enter one's curtilage it needs to secure a warrant or to satisfy one of the exceptions to the warrant requirement. *See Jardines*, 569 U.S. at 7–8. Our acknowledgment that those cases are no longer good law does not affect the qualified-immunity analysis here, which looks to the law at the time of the challenged action. *See Harlow*, 457 U.S. at 818. But it does put officers on notice that principles of *Jardines* and *Collins*—and not *Hardesty* or *Turk*—should guide their actions going forward.

**Municipal liability**

The district court erred in granting summary judgment in favor of the county and county officials, however. A municipality is a "person" under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible. *Monell*, 436 U.S. at 690. The scope of that responsibility does not include *respondeat superior* liability: a municipality is liable only for its own wrongdoing, not the wrongdoings of its employees. *Baynes*, 799 F.3d at 620. The upshot is that municipalities can be held liable for harms caused by direct actions of the

municipalities themselves, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986), harms caused by the implementation of municipal policies or customs, *see Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993), and harms caused by employees for whom the municipality has failed to provide adequate training, *see Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 738 (2018).

Each of these different approaches to liability requires a different analysis. But each approach seeks to answer the same fundamental question: did the municipality cause the harm or did an individual actor? When the injury is a result of an action of an employee who has not been trained properly, we apply "rigorous requirements of culpability and causation"—holding a municipality liable if it has been deliberately indifferent to constitutional rights. *Arrington-Bey*, 858 F.3d at 995 (quoting *Brown*, 520 U.S. at 415). On the other end of the spectrum, when an act of the municipality itself causes the injury, "fault and causation obviously apply." *Id.* at 994. Likewise, when an injury is caused by the straightforward carrying out of a municipal policy or custom, the determination of causation is easy. *See Garner*, 8 F.3d at 364–65.

Although *Garner* has been the law in this circuit since 1993, we have developed an additional strand of case law analyzing municipal liability for policies or customs. In *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006), we concluded that if a challenged policy is facially constitutional, the plaintiff must show that the policy shows a deliberate indifference to constitutional rights. *Id.* Thus, *Gregory* analyzed failure-to-train claims and challenges to facially constitutional municipal policies under the same standard. But as we held in *Garner*, and recently reaffirmed in *Arrington-Bey*, "[t]here are important differences between these types of claims" and so we must analyze them differently. *Arrington-Bey*, 858 F. 3d at 994. That means that we must be careful not to apply *Gregory* too broadly. *Gregory* may help to determine municipal liability when an employee's *interpretation* of a policy causes harm. But that is not the case here. Like *Garner*, this case presents a straightforward challenge to the county's policy itself. And, as in *Garner*, we apply a straightforward test: Morgan and Graf must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [their] particular injur[ies] [were] incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner*, 8 F.3d at 364).

Morgan and Graf have made that showing.  It is uncontested that the county's policy required officers to enter "*onto* the back" of any property during *every* 'knock and talk.'  And as acknowledged by the sheriff and members of the SCRAP unit, that policy did not give any leeway for the officers to consider the constitutional limits that they might face.  The SCRAP unit did not weigh the characteristics of properties to determine what parts of the properties were curtilage (and thus off limits).  The policy gave no weight to the core value of the Fourth Amendment—one's right to retreat into his or her home "and there be free from unreasonable government intrusion."  *Collins*, 138 S. Ct. at 1670 (quoting *Jardines*, 569 U.S. at 6).  Quite the opposite:  the policy commanded that the SCRAP unit ignore those limits.  It was not one employee's interpretation of a policy that caused Morgan's and Graf's injuries—the policy was carried out precisely as it was articulated.  And so, because the county's policy itself was the cause of Morgan's and Graf's injury, the county should be held liable under *Monell*.

## CONCLUSION

It is well-established that a warrantless entry of the home or the area immediately surrounding the home is presumed unreasonable unless it meets one of a few narrow exceptions.  The SCRAP unit, following official policy, entered the constitutionally protected area around Morgan's and Graf's home without a warrant and without satisfying any of the narrow exceptions to the warrant requirement.  In doing so, they violated the Fourth Amendment.  But because of the state of this circuit's Fourth Amendment law at the time of the search, it was not clearly established that members of the SCRAP unit could not do what they did.  For that reason, we **AFFIRM** the district court's decision granting summary judgment to the individual officers based on qualified immunity.  On the other hand, because the county's policy itself required officers to ignore the Constitution's rules protecting the curtilage and the home, we **REVERSE** the decision of the district court granting summary judgment to the county and the county officials in their official capacities.  We **REMAND** the case for further proceedings consistent with this opinion.

———————————

**CONCURRENCE**

———————————

JANE B. STRANCH, Circuit Judge, concurring. I join the majority opinion in full. I write separately only to emphasize the unique circumstances that merit applying qualified immunity in this case. As the Supreme Court recently reaffirmed, it "has long been clear that curtilage is afforded constitutional protection," and "officers regularly assess whether an area is curtilage before executing a search." *Collins v. Virginia*, 138 S. Ct. 1663, 1674–75 (2018) (citing *Oliver*, 466 U.S. 170, 180 (1984)). Despite this fundamental principle, our jurisprudence has evidenced some confusion related to the police action that we refer to as "'knock and talk' investigations." *See United States v. Darden*, 508 F. App'x 387, 388 (6th Cir. 2012); *Hardesty v. Hamburg Township*, 461 F.3d 646, 654 (6th Cir. 2006) (referencing the "knock and talk investigative technique already recognized in this circuit"). A materially indistinguishable case, *Turk v. Comerford*, 488 F. App'x 933 (6th Cir. 2012), demonstrates that, at the time of the search at issue, even federal appellate judges were struggling with assessments of curtilage in the limited context of knock-and-talk investigations. It is rare to have a contemporaneous circuit case revealing judicial confusion on the precise question confronted by police officers. The existence of one here supports finding the law sufficiently unsettled that the officers should receive qualified immunity.

This case, moreover, presents different circumstances from even *Wilson v. Layne*, 526 U.S. 603, 618 (1999), referenced by the majority. There, the Supreme Court acknowledged that the "state of the law" at the time of the constitutional violation was "undeveloped" and that a circuit split had arisen between the alleged violation and that Court's ultimate decision. *Id.* The Supreme Court therefore declined to punish the officers' lack of prescience. *Id.* But the case before us is quite unlike the open question in *Wilson*, which had percolated up through the circuits on its way to final resolution by the Supreme Court. As explained in the majority opinion, *Turk* and *Hardesty* instead stand alone on a doctrinal spur. For purposes of this case, however, *Turk* is sufficient to show that the law surrounding knock and talk investigations was

muddy at the relevant time. Though this is the unusual case in which an outlier may insulate officers from liability, today's decision forecloses that possibility for future cases.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

THAPAR, Circuit Judge, concurring in part and dissenting in part. The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. This mandate, though seemingly straightforward, has generated a morass of legal precedent that is often confusing, contradictory, and incomplete. After over two-hundred years, we are still not sure whether the Amendment protects privacy or property, and, in turn, what questions are relevant for determining whether a search occurred or if it was reasonable.

At times like this, courts should turn back to first principles. The Amendment's text tells us that a Fourth Amendment violation occurs when three things are true: (1) the government engages in a search, (2) of a person, house, paper, or effect, (3) that unreasonably violates a person's right to be secure in that object. To understand the meaning of those terms and place those inquiries in context, we look to the Fourth Amendment's meaning at the founding. For example, history shows that a "search" meant then what it means now: a purposeful, investigative act (and nothing more). When we apply this meaning to Morgan and Graf's case, no Fourth Amendment violation occurred here: the county's policy did not direct the officers to conduct a search. And, for slightly different reasons, existing Supreme Court precedent compels the same conclusion. Therefore, I concur in the majority's decision to affirm the grant of qualified immunity but dissent from the *Monell* liability holding.

I.

Some words in the Constitution are "terms of art." *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 813–15 (2010) (Thomas, J., concurring in part and concurring in the judgment) ("due process of law"); *Collins v. Youngblood*, 497 U.S. 37, 41 (1990) ("ex post facto law"); *Holland v. Illinois*, 493 U.S. 474, 493 (1990) ("jury"). The word "search," however, is not one of them. *See Carpenter v. United States*, 138 S. Ct. 2206, 2238 (2018) (Thomas, J.,

dissenting); Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 Sup. Ct. Rev. 67, 71–72 (2012) (noting that the question of what "search" meant "rarely arose" at the time of the founding).  Instead, we look to the ordinary meaning to define the term.  And the ordinary meaning of "search" has remained unchanged since the people ratified the Fourth Amendment over two hundred years ago.  To search is "to look into or over carefully or thoroughly in an effort to find something."  *Webster's Third New International Dictionary of the English Language* (2002); *see also* 2 Noah Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989) ("To look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief.").[1]   In other words, officers conduct a search when they engage in a purposeful, investigative act.

Some examples bring the definition to life.  Kerr, *supra*, at 72 ("The little evidence of what searches meant in the late eighteenth century is mostly by way of example.").  Start with the oppressive English search practices that inspired the founding generation to adopt the Fourth Amendment.  *See Riley v. California*, 134 S. Ct. 2473, 2494 (2014); Leonard Levy, *Origins of the Bill of Rights* 160–61 (1992).  In the mid-eighteenth century, Parliament authorized writs of assistance, which allowed colonial customs officials to search people's homes for goods that were illegally imported.  *See* Emily Hickman, *Colonial Writs of Assistance*, 5 New Eng. Quart. 83, 83–84 (1932); Levy, *supra*, at 156–57; *see also Stanford v. Texas*, 379 U.S. 476, 481 (1965) ("The hated writs of assistance had given custom officials blanket authority to search where they pleased for goods imported in violation of the British tax laws.").  These searches were intrusive.  Indeed, Charles Paxton, a famous "Surveyor and Searcher" in Massachusetts, was permitted to enter into any ship, vessel, shop, house, warehouse, or other place "to make diligent search into any trunk[,] chest[,] pack[,] case[,] truss[,] or any other parcel or package whatsoever."  Josiah Quincy, Jr., *Reports of Cases Argued and Adjudged in the Superior Court of Judicature of the Province of Massachusetts Bay Between 1761 and 1772* at 420 (Boston, Little, Brown & Co.

---

[1]*See also* 2 Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1773) ("Inquiry by looking to every suspected place."); 2 John Ash, *The New and Complete Dictionary of the English Language* (2d ed. 1795) ("An enquiry, an examination, the act of seeking, an enquiry by looking into every suspected place; a question; a pursuit.").

1865). In arguing against this sweeping search authority, James Otis contended that customs officials should not have authority to enter a person's home and "rifle every part of it." *Essay on the Writs of Assistance Case*, Boston Gazette, Jan. 4, 1762; *see* 10 *Works of John Adams* 248 (C. Adams ed. 1856) (referring to James Otis's speech denouncing writs of assistance as where "the child Independence was born"). Others complained that their "houses and even [their] bed chambers, [were] exposed to be ransacked," and their "boxes[,] chests & trunks broke open[,] ravaged and plundered." Levy, *supra*, at 166.

Meanwhile in England, King George III's Secretary of State, Lord Halifax, began issuing general warrants to go after the authors, publishers, and printers of newspapers critical of the English government. Laura Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1197, 1201, 1205 (2016). Among dozens of others, John Wilkes, John Entick, and Dryden Leach were suspects. The King's messengers went to Wilkes's home first, walked inside, broke the locks on his desk drawers, and "rummaged all the papers together they could find." *Wilkes v. Wood*, (1763) 98 Eng. Rep. 489, 491 (K.B.). A few months later, they went to Entick's home and searched "all the rooms . . . and all the boxes so broken open, and read over, pryed into, and examined all [of his] private papers [and] books." *Entick v. Carrington*, (1765) 95 Eng. Rep. 275, 275 (K.B.). And finally, they paid Leach a visit and spent six hours searching his home for his books and papers. *Money v. Leach*, (1765) 97 Eng. Rep. 1075, 1079 (K.B.). In all three cases, the King's messengers were found liable for trespass. *Leach*, 97 Eng. Rep. at 1089; *Entick*, 95 Eng. Rep. at 818; *Wilkes*, 98 Eng. Rep. at 499. But more importantly, these cases and the colonies' growing opposition to writs of assistance provide some context about what the founding generation envisioned by the term "search": looking through somebody's belongings to find evidence of something illegal. *See* Kerr, *supra*, at 72 ("Famous search and seizure cases leading up to the Fourth Amendment involved physical entries into homes [and] violent rummaging for incriminating items once inside . . . .").

The meaning of "search" at the founding did not change after the United States won independence. Though the English could no longer search our homes to find uncustomed goods, Anti-Federalists feared that the federal government would adopt the same oppressive search practices that England used to collect taxes. In 1788, "A Farmer and Planter" penned an essay

expressing concern that federal excise officers would "break open [their] doors, chests, trunks, desks, [and] boxes, and rummage [their] house[s] from bottom to top" for goods for which no tax had been paid.  A Farmer and Planter, in 5 *The Complete Anti-Federalist* 75 (Herbert J. Storing ed. 1981); *see also* John DeWitt Letter IV, in 4 *The Complete Anti-Federalist* at 33; A Columbian Patriot, in 4 *The Complete Anti-Federalist* at 278–79.  Patrick Henry contended that tax collectors "may go into your cellars and rooms, and search, ransack, and measure, every thing [people] eat, drink and wear."  3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 448–49 (Jonathan Elliot ed., 2d ed.1836).

And after the people ratified the Fourth Amendment to protect against such abuses, early courts confirmed this understanding of a "search."  Those courts found that searches had occurred where officers opened and examined sealed letters or packages, *Ex parte Jackson*, 96 U.S. 727, 732 (1877), looked through a man's shop and apartments for jewelry, *Larthet v. Forgay*, 2 La. Ann. 524, 525 (La. 1847), poked through a man's cellar to look for stolen barrels of flour, *Bell v. Clapp*, 10 Johns. 263, 265 (N.Y. 1813) (per curiam), and entered a man's house, "turned over the beds," looked through "every hole" and "required every locked place to be opened," *Simpson v. Smith*, 2 Del. Cas. 285, 287 (Del. 1817).

This history thus shows that when the Framers used the word "search," they meant something specific: investigating a suspect's property with the goal of finding something.  *See Katz v. United States*, 389 U.S. 347, 367 (1967) (Black, J., dissenting) ("The Fourth Amendment was aimed directly at the abhorred practice of breaking in, ransacking and searching homes and other buildings and seizing people's personal belongings . . . .").  In this way, the original meaning of the term matches the ordinary one. A "search" under the Fourth Amendment is what we would intuitively think a search looks like in any other context.

The Supreme Court's current Fourth Amendment jurisprudence, however, has taken the meaning of "search" a step further.  Rather than simply asking whether the government engaged in purposeful, investigative conduct, both of the Court's prevailing tests add a threshold question that conflates the search inquiry with the reasonableness one.  Start with *Katz*'s "reasonable expectation of privacy" test.  *Id.* at 361 (Harlan, J., concurring).  Under that framework, the Court is willing to apply the Fourth Amendment's protections only if the officers' conduct

violates a person's "(subjective) expectation of privacy" that "society is prepared to recognize as reasonable." *Id.* But a search can plainly occur regardless of whether a person reasonably believes the area the officers rummage through is private. We can see as much from the cases that apply *Katz*'s test. Consider *California v. Greenwood*, where the Court held that an officer who rifled through a suspect's garbage to find evidence of drug use did not conduct a search because the suspect could not reasonably expect the garbage to remain private after putting it out for collection. 486 U.S. 35, 37–38, 40 (1988). Or consider *United States v. Miller*, where officers read through a suspect's bank records to investigate tax evasion. 425 U.S. 435, 437 (1976). The Court held that no search occurred because the suspect had exposed the records to the bank's employees and thus forfeited his privacy in them. *Id.* at 442.

In both cases, the jurisprudence is misguided: the officers engaged in a search because looking through somebody's garbage or financial records for evidence of a crime is purposeful, investigative conduct. And whether we think the officers' conduct was permissible—either because the suspect abandoned the garbage or shared the bank records with third parties—does not change that result. Those considerations get at whether the search was *reasonable*, not whether a search *occurred* in the first place. *See Carpenter*, 138 S. Ct. at 2243 (Thomas, J., dissenting) ("[R]easonableness determines the legality of a search, not 'whether a search . . . within the meaning of the Constitution has *occurred*.'" (quoting *Minnesota v. Carter*, 525 U.S. 83, 97 (1998) (Scalia, J., concurring))); Akhil R. Amar, *Fourth Amendment First Principles*, 107 Harv. L. Rev. 757, 769 (1994) ("[I]n the landmark *Katz* case, the Court, perhaps unconsciously, smuggled reasonableness into the very definition of the Amendment's trigger . . . ."); *see also* William Baude & James Y. Stern*, The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1871 (2016) ("The structure of the doctrine is especially puzzling in the *Katz* regime, which creates a separate reasonableness analysis at the first step of the Fourth Amendment framework, prior to evaluating the reasonableness of the government's conduct at the second step."). Smuggling both questions into one is not faithful to the Amendment's text and ends up narrowing the scope of its coverage. *See Knowlton v. Moore*, 178 U.S. 41, 87 (1900) (noting the "elementary canon of construction which requires that effect be given to *each word* of the Constitution" (emphasis added)); *see also Carpenter*, 138 S. Ct. at 2246 (Thomas, J., dissenting) (noting that the *Katz* test "threatened to narrow the original scope of the Fourth

Amendment"); Thomas K. Clancy, *What Does the Fourth Amendment Protect: Property, Privacy, or Security?*, 33 Wake Forest L. Rev. 307, 331–34 (1998) (listing cases "rejecting any legitimate expectation of privacy" or finding only a "reduced expectation of privacy" under *Katz*).

After almost five decades of *Katz* precedent, it became apparent that requiring a reasonable expectation of privacy pushed too much police conduct outside of Fourth Amendment scrutiny. So in *United States v. Jones*, the Court made clear that a litigant's rights "do not rise or fall with the *Katz* formulation" if that formulation does not "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." 565 U.S. 400, 406 (alterations in original) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). The Court told us that there was another way to determine whether a search occurred: asking whether the officers "learned what they learned only by physically intruding on [one's] property to gather evidence." *Florida v. Jardines*, 569 U.S. 1, 9 (2013); *see also Jones*, 565 U.S. at 405. This property-based approach is closer to the ordinary and original meaning than *Katz*. But it, too, imposes an artificial limit on the meaning of "search." A search can occur without an "intrusion" (or as elsewhere described, a "trespass"). *Jones*, 565 U.S. at 405; *see also* Kerr, *supra*, at 68 ("Neither the original understanding nor Supreme Court doctrine equated searches with trespass."). For example, imagine that John Entick invited the King's messengers into his house and gave them permission to look through his drawers for his books and papers. Would anybody contend that the messengers did not *search* Entick's home under the ordinary meaning of the word simply because they were legally present? No. The officers engaged in purposeful and investigative conduct. And whether we think the messengers' conduct is permissible because Entick authorized them to do it gets at the reasonableness of the search, not whether a search occurred. Like *Katz*'s reasonable expectation of privacy test, then, the "intrusion" or "trespass" question comes at the wrong place in the Fourth Amendment framework.

If we applied the ordinary and original meaning of the word "search" (and left the question of reasonableness where it belongs), many things that are currently considered outside the Amendment's scope might come back in. As discussed above, rifling through a person's garbage and reading through their bank records would both count as a search. *See Greenwood*,

486 U.S. at 37–38; *Miller*, 425 U.S. at 437. So too would flying a helicopter four-hundred-feet over a person's greenhouse to look through an opening in its roof. *See Florida v. Riley*, 488 U.S. 445, 448, 450 (1989). As would traipsing through somebody's farm to look for marijuana or peering into somebody's barn with a flashlight to see if they are doing something illegal. *See United States v. Dunn*, 480 U.S. 294, 298 (1987); *Oliver v. United States*, 466 U.S. 170, 173, 179–80 (1984).

Not only that, but faithfully applying the term's meaning may make the courts' initial job easier. Determining whether somebody has a subjective expectation of privacy that society is willing to recognize as reasonable leaves much to the "judicial imagination" and often results in judges deciding "whether a particular practice *should* be considered a search under the Fourth Amendment." *Carpenter*, 138 S. Ct. at 2264 (Gorsuch, J., dissenting); *id.* at 2246 (Thomas, J., dissenting). As a result, the Court's precedents applying *Katz* "bear the hallmarks of subjective policymaking," which of course, courts are not equipped (or permitted) to do. *Id.* at 2246 (Thomas, J., dissenting); *see also Carter*, 525 U.S. at 97 (Scalia, J., concurring) (pointing out that "unsurprisingly, those 'actual (subjective) expectation[s] of privacy' 'that society is prepared to recognize as reasonable,' bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable" (alterations in original) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring))). Asking whether an officer engaged in a purposeful, investigative act brings courts back into their wheelhouse: analyzing the facts before them.

Returning to the original meaning would also eliminate the property-based approach's threshold question—whether there was an intrusion or trespass—simplifying the initial search inquiry. The Court's decision in *Kyllo v. United States* shows why. 533 U.S. at 27. There, the Court had to decide whether officers conducted a search when they used a thermal imager to scan the outside of a home for heat signatures. *Id.* at 29–30. One possible answer could have been no. The Court had long held that "naked-eye surveillance of a home" did not amount to a search because "the eye cannot . . . be guilty of trespass." *Id.* at 31–33 (internal quotation marks omitted). But the case at hand presented something different: the officers were using more than their naked eye yet doing something short of common law trespass. *Id.* To thread the needle, the Court held that "obtaining by sense-enhancing technology any information regarding the interior

of the home that could not have been obtained without physical intrusion into a constitutionally-protected area constitutes a search—at least where (as here) the technology in question is not in general public use." *Id.* at 34 (internal quotations and citation omitted). What to do if the technology *is* in general public use, the Court has not said. And how to go about analogizing ever-evolving technology to on-foot search techniques will likely prove more difficult than the Court envisions. Under the ordinary and original meaning of "search," however, neither question arises. The officers conducted a search in *Kyllo* because using a thermal imager to determine whether heat is emanating from a house is a purposeful, investigative act.

A "search" under the Fourth Amendment is thus easier to identify when we are faithful to the ordinary and original meaning of the term, and the concept is broader than the Court's current jurisprudence contemplates.

II.

This brings me to the case at hand. The Fairfield County police received two anonymous tips that Morgan and Graf grew marijuana and cooked methamphetamine in their house. So five officers went to their home for a "knock and talk," a police tactic where an officer walks up to the front door of a house and seeks to speak with a suspect and/or gain consent for a search. Consistent with county policy, two officers walked up to the front door, and the rest surrounded the perimeter of the house, standing five-to-seven feet from its exterior. One officer went around back and noticed marijuana plants growing on Morgan and Graf's second-story deck. With this information, the officers secured a warrant to search inside the home. Now Morgan and Graf contend that when the officers surrounded the home, they engaged in an unreasonable search in violation of the Fourth Amendment.

*The City Policy.* Let's start with the policy. The question before the court is whether the policy directed officers to violate Morgan and Graf's rights. The answer under both current doctrine and the original meaning is no.

In *Jardines*, the Supreme Court held that an unreasonable Fourth Amendment search occurs when an officer intrudes a constitutionally-protected zone, i.e., the house, to gather

evidence.  *See* 569 U.S. at 6.  So, to be unconstitutional, the policy must direct officers (1) to enter a constitutionally protected zone, and (2) to gather evidence.  *Id.* at 9.

Here, the majority is correct that the policy directed officers to enter a constitutionally-protected zone.  Morgan and Graf have a right to be secure in their home, which includes the curtilage of the home.  *See id.* at 6 (noting that "curtilage" is the area "immediately surrounding and associated with" a house); *Amos v. United States*, 255 U.S. 313, 314, 346 (1921); *see also Dunn*, 480 U.S. at 294 ; *Oliver*, 466 U.S. at 180; 4 William Blackstone, *Commentaries on the Laws of England* *225 (noting that the "capital house protects and privileges all its branches and appurtenants, if within the curtilage").  Since the county policy required the officers to go "onto the back of the property" and generally be within "five-to-seven feet" of the house, it directed them to enter the curtilage.  R. 45-7, Pg. ID 542; R. 45-6, Pg. ID 533.

But the county policy *did not* direct officers to gather information while there.  As such, there is no search.  *See Jardines*, 569 U.S. at 6 (holding that to be a search officers must gather information while in the protected zone); *see also Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) ("When a law enforcement officer physically intrudes on the curtilage *to gather evidence*, a search within the meaning of the Fourth Amendment has occurred." (emphasis added)); *Jones*, 565 U.S. at 406 n.3.  For if an officer is trick-or-treating with their kids in the constitutionally protected zone, it is not a Fourth Amendment problem.  Nor is it a problem if an officer is "approaching your home to return your lost dog or to solicit for charity."  *United States v. Carloss*, 818 F.3d 988, 1005 (10th Cir. 2016) (Gorsuch, J., dissenting).  The officer must engage in some sort of investigation to implicate the Fourth Amendment's protections.  *Jardines*, 569 U.S. at 6.  Yet the county policy directing officers to secure the perimeter is designed to do one thing: ensure officer safety.  As the officers testified, whenever they conduct a knock and talk, there is a risk that the officer knocking on the front door "could be ambushed by somebody coming out of the back door."  R. 45-6, Pg. ID 525.  Or a dangerous individual might flee the residence.  And since the officers suspected that Morgan might have been dangerous, the policy required an officer to stand at every corner of the house.  If the policy had required the officers surrounding the house to also investigate while there, the county would be directing the officers to violate the Fourth Amendment.  But the county's policy was silent as to any information-

gathering mandate for the officers. As such, the policy *itself* did not direct the officers to violate the Fourth Amendment.

Similarly, when analyzing the policy under the original meaning, the answer is the same. But the first question is different. Whereas the property-based approach asks whether the officers were in a constitutionally-protected zone, the original meaning asks if those officers were conducting a search. The key inquiry is not whether officers conduct a search while *in the* protected area, but rather whether they conduct a search *of the* protected area. *See infra* Part I. While this distinction may lead to different outcomes in other cases, in Morgan and Graf's case it does not. Here the county's policy did not direct officers to engage in a purposeful, investigative act of Morgan and Graf's home. Accordingly, since there was no search directed by the policy, no constitutional violation occurred under the original meaning of the Fourth Amendment.[2]

*The officers.* Turning to the officers, I agree with the majority that the constitutional violation was not clearly established. But, if I was writing on a clean slate, I would remand. And the question I would direct the district court to answer is whether the officers engaged in a purposeful, investigative act to find the marijuana plants.

### III.

As the county's policy did not direct a search in Morgan and Graf's case (and the original meaning approach to the Fourth Amendment would require a remand to determine whether the

---

[2]That is, of course, not to say that police officers should be allowed to run roughshod over people's property so long as a court does not determine that they conducted a search. The officers in this case could be liable for trespass. Under Ohio law, no person is permitted to "[k]nowingly enter or remain on the land or premises of another." Ohio Rev. Code Ann. § 2911.21(A)(1) (criminal trespass statute). And though the officer at the front door was permitted to walk up to the house and knock without violating the law, the other officers were not allowed to use his lawful presence as a gateway to the rest of his property. *See Gladon v. Greater Cleveland Reg'l Transit Auth.*, 662 N.E.2d 287, 292 (Ohio 1996) ("If the invitee goes outside the area of his invitation, he becomes a trespasser or a licensee, depending upon whether he goes there without the consent of the possessor, or with such consent." (quoting Restatement (Second) of Torts § 332 (Am. Law Inst. 1965))). Ohio immunity may ultimately bar such a suit, but should practices become sufficiently egregious, the people of Ohio could change whether immunity applies. Indeed, private tort suits against officers used to be the *only* mechanism to assert a Fourth Amendment right—the exclusionary rule, Section 1983, and *Bivens* actions did not yet exist. *See Collins*, 138 S. Ct. at 1676 (Thomas, J., concurring) ("Historically, the only remedies for unconstitutional searches and seizures were 'tort suits' and 'self-help.'"); *Gardner v. Neil*, 4 N.C. 104, 104 (1814); Akhil R. Amar, *The Bill of Rights* 69 (1998) (noting that the "paradigmatic way in which Fourth Amendment rights were to be enforced" was through civil suits under common law tort claims).

officers in fact "searched"), the court need not go further. If there had been a search, however, then I would continue to adhere to a Fourth Amendment analysis guided by the Amendment's text and its original meaning. To do this analysis, ordinarily the court would need to look at the contours of the constitutionally-protected zones—persons, houses, papers, and effects. U.S. Const. amend. IV; *see, e.g.*, Maureen E. Brady, *The Lost "Effects" of the Fourth Amendment: Giving Personal Property Due Protection*, 125 Yale L.J. 946, 987 (2016). Such an analysis would not prove difficult here as the marijuana plants were squarely within a constitutionally-protected zone, i.e., on the back-deck within the house's curtilage.[3] The court would also need to decide the appropriate source of law to determine when a person is "secure in" one of those constitutionally-protected zones. *See Carpenter*, 138 S. Ct. at 2241–42 (Thomas, J., dissenting); *id.* at 2269 (Gorsuch, J., dissenting). For instance, similar to the Fifth and Fourteenth Amendments, should courts look to state property law to determine what rights someone has in the constitutionally-protected zone? *See* Baude & Stern, *supra*, at 1842–43 (suggesting courts look to existing law (usually state) to determine constitutional protections); Richard Re, *The Positive Law Floor*, 129 Harv. L. Rev. F. 313, 332 (2016) ("[W]hen lawmakers guard against privacy intrusions by private parties, then similar intrusions by the government would be presumptively unreasonable."). And, of course, the court must grapple with the appropriate meaning and function of the term "unreasonable." While strong evidence suggests that "unreasonable" should be understood as "against the common law," there is evidence that the original public meaning may have been broader. *Compare* Donahue, *supra*, at 1192 (arguing that "unreasonable" means "against the common law"), *with* David A. Sklansky, *The Fourth Amendment and Common Law*, 100 Colum. L. Rev. 1739, 1778–84 (2000) (describing that "unreasonable" may have encompassed more than "against the common law"). Some of these inquiries might prove relatively easy, while others are certainly hard. But, luckily, judges are aided in this endeavor by the contributions of very astute scholars. And in the end, courts and parties will benefit from thoughtful briefing and scholarship that brings clarity to the Fourth

---

[3]Though not presented by this case, how ever-changing technology fits within the contours of these zones may continue to challenge courts. *See* Orin S. Kerr, *The Fourth Amendment and New Technologies: Constitutional Myths and the Case for Caution*, 102 Mich. L. Rev. 801, 807 (2004) (arguing that "regulating developing technology through the Fourth Amendment poses significant difficulties for courts").

Amendment's meaning and certainty to a search and seizure jurisprudence that has long since gone awry.

*        *        *

While I believe it is time for the courts to be more faithful to the Fourth Amendment's text, I am duty-bound to apply Supreme Court precedent.  Therefore, I concur in part and dissent in part.